**In re Jake HELMUTH and Irene Helmuth, Debtors.**

**Bankruptcy No. 83–00219–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Oct. 31, 1988.

As Amended and Corrected Nov. 1, 1988.

William Russell Gibson, Fayetteville, Ark., for debtors.

Paul Blevins, Pryor, Okl., for American Bank of Oklahoma.

Peter Bernhardt, Asst. U.S. Atty., Tulsa, Okl., for Farmers Home Admin.

## MEMORANDUM ORDER AND DECISION

MICKEY DAN WILSON, Bankruptcy Judge.

### STATEMENT OF FACTS

Mr. and Mrs. Helmuth ("Debtors") filed this bankruptcy petition seeking relief under Chapter 11 of Title 11 a number of years ago and subsequent thereto filed their schedules which includes claims of exemption. The Debtors are dairy farmers and have been since 1961 and dairy farming and other farming related activities are their sole source of income. After various and sundry amendments to the claim of exemption, Debtors claim personal property as exempt in the amount of $143,850.00 [1] pursuant to 31 O.S.A. (1981) 1 et seq.

---

1. The claim of exemption in equipment, tools of the trade and other personal property finally made by the debtors is as follows:

| | | | |
|---|---|---|---|
| 1978 1086 IHC Tractor SR # 21225 | | | $ 16,500.00 |
| 1980 Case 1210 Tractor SR # 1212–11165681 w/Case Model 65 Loader SR # 1648268 | | | $ 9,500.00 |

American Bank of Oklahoma ("American Bank") and Farmers Home Administration ("FmHA") timely object to the claim of exemption and Debtors file their motion to avoid the lien of American Bank and FmHA. Both American Bank and FmHA have a valid, perfected, non-purchase-money, non-possessory security interest in all equipment owned by the Debtors. The Debtors then file their motion to avoid the lien of American Bank and FmHA. Evidence shows and it is not contested that there is no equity interest in the equipment and that the amount of allowed secured claim of each creditor exceeds the value of the personalty sought to be exempted. At the time of the filing of the bankruptcy petition the dairy herd of the Debtors consisted of about one hundred fifty milk cows which was composed of leased cattle and all such cattle were returned to the lessor about three and one-half months after the filing of the petition in bankruptcy and thereafter the Debtors continued their farming operations growing cash crops and forage, the forage to be used in the maintenance of another herd when and if the Debtors acquired the same. The objections to the claim of exemption and motion to avoid lien were consolidated for purposes of trial.

## CONCLUSIONS OF LAW

Let this be made clear. Debtors borrowed money only on condition they grant a security interest in collateral valued at over $140,000 to secure repayment of the loan; now Debtors propose to keep the money and the collateral, cancel the security interest worth over $140,000, and walk away, leaving the lender with nothing.

Debtors say the law lets them do this. The "law" in question is actually several laws, interacting in Oklahoma bankruptcy cases. 11 U.S.C. § 522(b) provides for exemption of certain estate property to Debtors in bankruptcy, as specified in 11 U.S.C.

| | |
|---|---|
| 1980 Chevrolet 1 Ton flat bed Pickup SR # ccw33av129101 | $ 5,000.00 |
| 1952 AC WD45 Tractor SR # 4530911G | $ 700.00 |
| 1952 Chev. 1½ Ton Truck SR # 5UKE2171 (cracked block) | $ 500.00 |
| 1979 MF 250 Forage Chopper SR # 1919101800 | $ 3,000.00 |
| 1976 (2) Calhoun Forage wagons SR # 4–312 | $ 5,000.00 |
| 1978 Gehl 99 Forage Blower Model FB–99 SR # 9218 | $ 1,500.00 |
| 1980 NH 114 Pivot Tongue Mower Cond SR # 380621 | $ 7,000.00 |
| 1968 Case 960 Combine 16′ Header SR # 8339252 | $ 3,000.00 |
| 1980 Bush Hog 19′ Disc Model 1439 SR # 1100629 | $ 5,000.00 |
| IHC 12′ Disc | $ 200.00 |
| Graham Hoeme 16′ Chiesel Plow | $ 1,000.00 |
| Ford 4 Ros Planter Model 311 SR # 3037 | $ 500.00 |
| 1966 Farmhand Hay Grinder Model F83B SR # 261 | $ 750.00 |
| Badger 6′ Manure Pump | $ 200.00 |
| 1968 Field Sprayer Bailey w/200 gal tank | $ 300.00 |
| JD Grain Drill | $ 200.00 |
| Marathon Electric 75 hp Motor Frame | $ 1,500.00 |
| Win Power 45 kw PTO Generator SR # FF1269-57 | $ 1,500.00 |
| Mone 6′ Rotary Mower | $ 250.00 |
| Shop Built Blade | $ 100.00 |
| 8′ 5″ Auger w/electric motor | $ 100.00 |
| 20 ft. Gooseneck Trailer w/grain sides | $ 3,000.00 |
| 12 ft. Grain Auger | $ 150.00 |
| 62 ft. Mayrath Auger w/wheels | $ 1,500.00 |
| 1 HC 4 Row Cultivator | $ 200.00 |
| Harvestor Supplement Meter | $ 200.00 |
| A O Smith 14 ft. × 12 ft. Belt Conveyer w/electric motor | $ 800.00 |
| A O Smith 1500 Gal. liquid Manure Spr. Model 1350 # 710186 | $ 2,000.00 |
| A O Smith 20 × 80 Harvestor w/sweeparm unloader | $ 4,000.00 |
| '76–'78 A O Smith 20 × 80 Harvestor Silo | $ 40,000.00 |
| '75–'78 Goliath Unloaders SR # 770771278 & 770651312 | $ 6,000.00 |
| 1975 A O Smith 100 ft. Beltfeeder | $ 3,500.00 |
| 1975 (2) A O Smith Chain conveyors Model 125 | $ 3,500.00 |
| (2) A O Smith Chain conveyors Model 105 44 ft | $ 3,500.00 |
| 400 BU Wa–Ro–Matic Rollermill | $ 1,500.00 |
| Butler 15 ton Bin w/15′–6″ Auger | $ 1,500.00 |
| 8 Unit Delaval Milker w/auto takeoffs/universal pump | $ 2,500.00 |
| 1500 Mueller–Matic Bulk Tank | $ 5,500.00 |
| (2) 4hp Compressors | $ 550.00 |
| (2) Water Tanks | $ 200.00 |
| Lincoln Welder–Cutting Torch–Misc. tools | $ 450.00 |
| | $143,850.00 |

§ 522(d), *or* only as specified in State exemption laws—regardless or exclusive of § 522(d)—*if* State exemption laws provide for their exclusive application in bankruptcy. 11 U.S.C. § 522(f) provides for avoidance of liens on certain exempt property, including "(2) . . . (B) implements . . . or tools, of the trade of the debtor or the trade of a dependent of the debtor . . ." 31 O.S.A. (1981) § 1(A)(6) provides for exemption of "[a]ll tools, apparatus . . . used in any trade or profession of such person or a dependent of such person." 31 O.S.A. (1981) § 1(B) provides that Oklahoma exemptions shall apply in bankruptcy exclusive of Federal exemptions under 11 U.S.C. § 522(d). According to Debtors, the combined effect of these statutes is as follows: under 11 U.S.C. § 522(b) and 31 O.S.A. § 1(B), Debtors can exempt in bankruptcy whatever they may exempt under Oklahoma exemption laws; under 31 O.S.A. (1981) § 1(A)(6), Debtors may exempt any items useful to them in their "trade" as farmers, absolutely regardless of value, size, complexity, or suchlike factors; under 11 U.S.C. § 522(f)(2), security interests in whatever is exempt as "implements of . . . tools . . ." are subject to lien avoidance, absolutely regardless of the collateral's value, size, complexity, or suchlike factors; therefore, in the present case, a security interest in farm equipment worth over $140,000 is avoidable.

According to the creditors the Debtors' interpretation mangles the Oklahoma exemption and the bankruptcy avoidance statutes; that the Debtors give meaning to the statutes never intended by the enactors thereof and that the intent and purpose of the exemption and avoidance statutes are lost in the maze of technical interpretations and go far beyond the liberal interpretation of the same; and creditors use examples of the "fresh start—head start", "Christmas comes early", and "wholesale giveaway" analogies and pray this Court deny Debtors' claim of exemption and the motion to avoid the particular creditors' liens.

The Court must determine whether 11 U.S.C. § 522(b), (d), (f) and 31 O.S.A. (1981) § 1(A)(6), (B) do indeed operate in the drastic manner proposed by Debtors. This is a question of statutory interpretation and construction, which in turn is primarily a question of legislative intent, *Watt v. Alaska*, 451 U.S. 259, 265–66, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80, (1981); *United States v. American Trucking Ass'n*, 310 U.S. 534, 542–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Boston Sand and Gravel Co. v. U.S.*, 278 U.S. 41, 48, 49 S.Ct. 52, 53–54, 73 L.Ed. 170 (1928); *Brewer's Lessee v. Blougher*, 39 U.S. 178, 198, 10 L.Ed. 408, 418 (1840); *Cabell v. Markham*, 148 F.2d 737, 738 (2nd Circ.1945); 73 AM. JUR.2D "Statutes" §§ 145, 146, 207. Here, the question involves the intent of different legislatures, Federal and State, enacting different laws at different times.

The intent of the United States Congress is paramount, since bankruptcy is a Federal matter, U.S. Constitution, Art. 1, § 8 cl. 4; Art. 6, cl. 2, and Oklahoma law operates in bankruptcy only to the extent it is adopted and allowed by Federal statute.

The Court observes that bankruptcy seems to have come a long way since its inception. In medieval Italy, it was a matter limited to merchants—whence the term "bankruptcy" from *banca rotta*, "broken bench", referring to the practice of physically destroying a defaulting merchant's market-stall, *The Oxford Dictionary of the English Language* (1971), "Bankruptcy." In England, it was primarily a creditors' remedy, a super-collection device which, it was said, sometimes went to the length of inflicting capital punishment on Debtors, James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America*, ed. Hunt and Scott, Prometheus Books (1987), Vol. 2, p. 504. In America, the first bankruptcy acts were short-lived emergency legislation, severely criticized as an incitement to deadbeatism and repealed as quickly as possible, Warren, *Bankruptcy in United States History*, Harvard University Press (1935). The first reasonably permanent American bankruptcy law was the Act of 1898, which effected a policy of granting Debtors "a fresh start" relieved of disastrous and overwhelming debt, *Local Loan Co. v. Hunt*,

292 U.S. 234, 244–45, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) and cases cited therein. Yet the fundamental reason for and characteristic of bankruptcy has always been receivership of *debtor's* property and equitable distribution of it to his creditors—the price of discharge, 9 AM.JUR.2d "Bankruptcy" § 1 Pg. 40. Whence comes any law that, as Debtors propose, takes away the property of *creditors* and gives it to Debtors—bonus in addition to discharge? Any such law would tend to give Debtors, not just a "fresh start", but a "head start".

The Act of 1898 adopted State exemptions for the benefit of Debtors in bankruptcy, Act of 1898, Sec. 6, former 11 U.S. C. Ch. 3 § 24. Wide variation in State exemption laws resulted in a widely variable "price of discharge," undesirable in policy and constitutionally suspect as a nonuniform bankruptcy, *Report of the Commission on the Bankruptcy Laws of the United States*, H.R.Doc. No. 93–137, 93d. Cong. 1st Sess., Pt. I p. 171, Pt. II p. 127; 3 *Collier on Bankruptcy* (15th ed. 1988) ¶ 522.02 pp. 522–12,–13; 1A *Collier on Bankruptcy* (14th ed. 1978) ¶ 6.02 pp. 795–796. It was also observed that exemptions were subverted by creditors' security interests, with especially obnoxious results in a common but narrow set of circumstances: "loan sharks" would take security interests in certain items, such as furniture and other personal effects, which had low resale value (so were of little use as collateral to reduce debt) but were important to Debtors out of all proportion to their resale value; such sensitive collateral was not actually repossessed and sold, but threats of repossession were used to extort repayment from Debtors. Thus, the security interest, supposed to be a reserve of value as an alternative to repayment in cash, became a collection device to force repayment in cash, H.R.Rep. No. 595, 95th Cong., 1st. Sess. 126–127, 166 ff. (1977), U.S.Code Cong. & Admin.News 1978, 5787.

A proposed new bankruptcy law would remedy these ills as follows: (1) a new set of standard Federal exemptions, applicable nationwide, would apply in bankruptcy to the exclusion of State exemptions, mindful of the function of bankruptcy exemptions as establishing the "price of discharge" and striking a balance between extremely liberal and extremely miserly State exemptions; and (2) "loan shark" security interests of the type described above would be subject to cancellation or avoidance, *Report of the Commission on the Bankruptcy Laws of the United States,* supra, Pt. I p. 173, Pt. II pp. 126, 130, re proposed Sec. 4. 4–503(f). The latter provision was radically new, and highly dangerous insofar as it provided for the destruction of creditors' interests in property without compensation. Such lien avoidance was justifiable if confined within its proper limits, as follows: it would be allowed only as to non-purchase-money security interests (to distinguish "loan sharks" from sellers and financers of legitimate enabling loans), in exempt property (so the property would be near and dear to Debtors) of certain specific types (which were generally of low resale value, so the creditor's security interest being avoided would likewise be of minimal value). See e.g. *In re Morris,* 12 B.R. 321, 7 B.C.D. 1336 (B.C., N.D.Ill.1981). (*In re Groves,* 707 F.2d 451 (10th Cir.1983) held 11 U.S.C. § 522(f) constitutional under the 5th Amendment due process clause; but did not address 11 U.S.C. § 522(f) in terms of the 5th Amendment takings clause. Whether 11 U.S.C. § 522(f) is constitutional under the 5th Amendment takings clause, where the security interest to be avoided is of demonstrably great value, was not raised by the parties in the matter now before this Court.) Moreover, since lien avoidance would operate only on certain specified types of exempt collateral, and since the Federal exemptions had relatively low value ceilings, lien avoidance would automatically operate only within narrow monetary limits and could not work to deprive any creditor of a security interest in collateral of great resale value. The fact that § 522(d), (f)(2) were intended to work together is shown by the use of parallel terminology in those two subsections; the descriptions of exempt property under § 522(d)(3), (4), (6) and (9) precisely match

the descriptions of collateral subject to lien avoidance under § 522(f)(2)(A), (B), and (C).

As the Bankruptcy Code was enacted, the above-described scheme was altered in one important respect. States' rights lobbyists caused 11 U.S.C. § 522(b) to be enacted in a form which permitted States to substitute their own exemption laws for the standard Federal exemption laws provided by § 522(d)—thus returning in part to the exemption system of the 1898 Act, 3 *Collier on Bankruptcy* (15th ed. 1988) ¶ 522.09 p. 522–44; Cong.Rec. (Oct. 6, 1978) p. S 17406, remarks of Senator Wallop: "[W]e have won an important victory for the rights of States to determine exemptions for the debtors of their States ..." No one seems to have thought of what this might do to operation of lien avoidance under 11 U.S.C. § 522(f)(2), (Committee reports and floor statements contain no warning that the limited purpose of lien avoidance would not dovetail with broad State exemptions. Senator Wallop's speech about State exemptions was apparently delivered to an inattentive Senate; Cong.Rec. (Oct. 6, 1978) p. S 17406: "Mr. President, I doubt at this moment in time that there are many people in the Chamber who are listening to me. Should there be, I am delighted ...") At the very least, the parallel terminology of exemption under § 522(d) and lien avoidance under § 522(f)(2) was upset. It was now unclear whether some item exempt under State law would be subject to lien avoidance under Federal law. More ominously, the automatic value limitation on lien avoidance under § 522(f)(2) resulting from the value limits on Federal exemptions under § 522(d) was removed; it was now possible that generous or unlimited State exemptions would result in massive or unlimited lien avoidance.

■ As a matter of Congressional intent, it is clear that lien avoidance under 11 U.S.C. § 522(f)(2) was designed to apply only to a narrow category of security interests *which were of minimal value*, and was never meant to apply to a broad range of security interests *regardless of value*. Section 522(f)(2) was not intended to avoid

security interests worth any significant amounts of money, certainly not security interests worth more than $140,000, as in the present case. Section 522(f)(2) was intended to protect families against overreaching by "loan sharks"; it was not intended, and should not be misused, to provide entrepreneurs with huge windfalls at the expense of banks and industry lenders.

■ Notwithstanding all this, the Court of Appeals of this Circuit has held that security interests in *any* exempt property which fit within the "plain words" of 11 U.S.C. § 522(f)(2) are subject to avoidance regardless of the value of the security interest thus avoided, *In re Liming, Central Nat'l Bank & Trust Co. of Enid, Okla. v. Liming*, 797 F.2d 895, 901 (10th Cir.1986) Aff'g 22 B.R. 740 (B.C., W.D.Okla.,1982). This decision is the law of this Circuit, which this Court is bound to follow.

■ The property here in question does fit within the terms "implements ... or tools" of 11 U.S.C. § 522(f)(2). Therefore, security interests in this property may be avoided, even to the extent of $140,000 worth—that is, if the property is exempt in the first place under Oklahoma law. This depends, in turn, on the intent of the Oklahoma Legislature as ascertained by Oklahoma courts.

For almost a century, Oklahoma statutory law exempted "[a]ll implements of husbandry used upon the homestead" and "[a]ll tools, apparatus ... used in any trade or profession" of debtor, 31 O.S.A. (1981) § 1(A)(5), (6). Although the statutory language seems unqualified and absolute, it should be given a reasonable construction and application, 12 O.S.A. (1981) § 2, 25 O.S.A. (1981) § 29, *In re Captain's Estate*, 191 Okl. 463, 130 P.2d 1002 (1942), *Nelson v. Fightmaster*, 4 Okl. 38, 44 P. 213 (1896) citing *In re Baldwin*, 71 Cal. 74, 12 P. 44 (1886); and Oklahoma case law has construed and applied exemptions in a reasonably limited manner. Regarding "all implements of husbandry used upon the homestead," it appears that the rural homestead itself is limited to only such land (up to a maximum of 160 acres) as constitutes the rural home's curtilage, *Elliott v. Bond*, 72

Okl. 3, 176 P. 242 (1918), *Kerns v. Warden*, 88 Okl. 297, 213 P. 70 (1923), *Harris v. Watts*, 102 Okl. 36, 226 P. 40 (1924), *Orwig v. Cloud*, 109 Okl. 299, 233 P. 1085 (1925), *Hickok v. Kennedy*, 177 Okl. 334, 58 P.2d 1236 (1936), *Powell v. Powell*, 189 Okl. 255, 116 P.2d 889 (1941), and see *In re Shields*, 85 B.R. 582 "Order Granting In Part and Denying In Part Trustee's Objection to Claimed Exemptions," B.C., N.D.Okla. (1988), *Black's Law Dictionary* (5th ed. 1979) "curtilage" p. 346; that the value, size, complexity, and business use of implements are factors bearing on their exemptability, *Nelson v. Fightmaster*, supra, citing *In re Baldwin*, supra; and that, accordingly, only those implements of husbandry should be exempt which are reasonably necessary and appropriate for use upon the curtilage. Regarding "all tools, apparatus ... used in any trade or profession," it appears that exemption was intended to reach inexpensive items, handheld or reasonably limited in bulk, complexity and artificial power, used by artisans, professional persons in the strict sense, or other skilled or semi-skilled workers in the personal exercise of their special aptitudes, *Brummage v. Kenworthy*, 27 Okl. 431, 112 P. 984 (1910), *Smith v. Roads*, 29 Okl. 815, 119 P. 627 (1911), *Edgin v. Bell–Weyland Co.*, 149 P. 1145 (Okla.1915), *Hoyt v. Pullman*, 51 Okl. 717, 152 P. 386 (1915).

In *In re Liming*, 22 B.R. 740 (B.C., W.D. Okla.1982), the Bankruptcy Court, Kline, J., took a broader view of exemption of "implements of husbandry" and permitted exemption of a tractor worth some $30,-000.00. The court cited none of the authorities and considered none of the factors mentioned above, but relied solely upon *Davis v. Wright*, 194 Okl. 451, 152 P.2d 921 (1944). In the latter case, a widow claimed probate exemption of a tractor; decedent's administrator objected on the ground that exemption of "motor vehicles" was forbidden by 31 O.S. (1941) § 8 and the tractor was a "motor vehicle" under 47 O.S. 1941 §§ 22.1, 22.3, 23.1 (the Motor Vehicle Act) and 68 O.S. 1941 § 49 (revenue and taxation statutes). The Oklahoma Supreme Court held that

The tractor here involved by definition, supra, is an implement of husbandry and not a motor vehicle as contemplated by 31 O.S. 1941 § 8 or as defined by 47 O.S. 1941 § 22.1 and 23.1 and consequently constituted exempt property to which the widow and minor children were entitled by virtue of the provisions of 58 O.S. 1941 § 312 and 31 O.S. 1941 § 1, subd. 4. See, also, *In re Slade's Estate*, 122 Cal. 434, 55 P. 158, and cases cited under annotations 52 A.L.R. 826 and 2 A.L.R. 818,

*Davis v. Wright*, supra, 152 P.2d at p. 921. The authorities cited in *Davis v. Wright*, supra, are problematical: *In re Slade's Estate*, 122 Cal. 434, 55 P. 158 (1898) concerns whether horticulture and viticulture are "husbandry" and has nothing to do with implements; the A.L.R. annotations do not mention tractors. The reasoning in *Davis v. Wright*, supra, seems flawed by the "fallacy of the transplanted category"—in this instance, taking a definition found in taxing and licensing statutes and inserting it into an exemption statute without regard for the different purposes of the statutes; see Hancock, "Fallacy of the Transplanted Category," 37 Can.B.Rev. 535 (Dec.1959). The fallacy was introduced by the administrator, who argued on appeal that exemption of motor vehicles was forbidden by the *exemption statute* and that tractors were motor vehicles according to *taxing and licensing statutes*. The Oklahoma Supreme Court seems to have turned this argument against the administrator by pointing out that the taxing and licensing statutes called farm tractors "implements of husbandry" and exempted them from the operation of said taxing and licensing statutes, so that *if* the taxing and licensing statutes had anything to do with the matter they would seem to indicate that the tractor was not a "motor vehicle" within those statutes, was an "implement of husbandry," and should be exempt. Thus, the Oklahoma Supreme Court disposed of the argument on appeal by pointing out its internal inconsistency, and did not mention any further infirmities in the argument. Otherwise, *Davis v. Wright*, supra, would imply that a tractor, fairly described as a

"motor vehicle" and forbidden to be exempt by 31 O.S. 1941 § 8, might nevertheless be exempt under another exemption category such as "implements of husbandry" under 31 O.S. 1941 § a4. Any such ruling was later contradicted and implicitly overruled by *Turner v. Brown*, 197 Okl. 638, 173 P.2d 943 (1946). In sum, *Davis v. Wright*, supra, is unsupported by authority, unclear, and either illogical or overruled.

Notwithstanding all this, in *In re Liming*, 797 F.2d 895 (10th Circ., 1986), the Court of Appeals of this Circuit affirmed Judge Kline and followed *Davis v. Wright*, supra.

In 1984 and 1987, the Oklahoma exemption statutes were amended. 31 O.S.A. (1981) § 1(A)(5), which had exempted "[a]ll implements of husbandry used upon the homestead," was amended to exempt "[i]mplements of husbandry necessary to farm the homestead;" 31 O.S.A. (1981) § 1(A)(6) was amended by striking the word "[a]ll." These amendments only caused the statutory language to conform more nearly to the interpretation that had long been placed on it by Oklahoma courts. Also, exemptions under 31 O.S.A. (1981) § 1(A)(5) and (6) were given express, specific dollar limits or ceilings of $5,000.00. This amendment likewise fairly approximates the former exemptions as construed and applied by case law. This Court determines that the "new" $5,000.00 limit is in the nature of a clarifying amendment to the original statutes, which was actually prompted by misinterpretation of the original statute in *In re Liming*, supra, and which does not substantially modify the original legislative intent, but only makes it explicit, specific and somewhat easier to apply and administer. This Court further determines that such clarifying amendments were actually prompted by misinterpretation of the original statute in *In re Liming*, supra. The act of the Oklahoma Legislature constituted an additional factor not available to the courts in *In re Liming*, supra, which distinguishes the rulings in that case and permits this Court to act in accordance with the intent of the Oklahoma Legislature notwithstanding *In re Liming*, supra.

It follows that, in the present case under the former statute, and despite the absence therein of an express dollar limit on exemptable property, it is appropriate to limit Debtors' allowable exemption to a maximum of $5,000.

Since the $5,000 figure is a maximum, not a minimum, Debtors might actually be entitled to exempt less than that amount. Where exemption and lien avoidance issues are combined, it is somewhat difficult to allocate the burden of proof, which would seem to be on the creditor-objector as to exemption and on the debtor-movant as to lien avoidance. In any event, the Court concludes that under the evidence herein, Debtors should be allowed to exempt up to $5,000 worth of their equipment.

Nothing in *In re Siegmann*, 757 P.2d 820 (Okla.1988) impels this Court to enlarge the exemption. In that case, the Oklahoma Supreme Court for the first time interprets the exemption statute as amended in 1987. Since the Oklahoma Supreme Court cited only one, and analyzed none, of its prior decisions construing the former statute, it appears that no overruling of former decisions or re-interpreting of the former statute was intended. Although the Oklahoma Supreme Court appears to take a very broad reading of the statutory terms, it must be remembered that the Oklahoma Supreme Court read those terms in the context of an express $5,000 limit which prevents the drastic or absurd results that would otherwise flow from an overbroad reading of the statutory words. This Court is convinced that the Oklahoma Supreme Court would never have read the statutory words so broadly in the absence of the $5,000 limit—as is shown by the fact that the Oklahoma Supreme Court actually did not read the statutory words so broadly in cases decided before the $5,000 limit was added to the statute, cited supra. In short, *In re Siegmann*, supra, must be taken to construe the statute as a whole as it exists with a $5,000 limit, and would be misapplied if read back into the prior statute so as to implicitly overrule earlier cases giving

that statute a limited construction and thus cause the prior statute's operation to be enlarged without limit.

Therefore, Debtors shall elect in writing within twenty (20) days the items which they desire to exempt in an amount not to exceed $5,000. This election is to be accomplished within twenty (20) days from June 30, 1988.

The objections by FmHA and American Bank to Debtors' claims of exemption are hereby granted in part and denied in part, and the motion by Debtors to avoid American Bank's lien is hereby granted in part and denied in part, all in accordance with the foregoing conclusions and instructions.

The foregoing memorandum order and decision memorializes, supplements and amends both the Court's oral announcement of decision from the bench on June 30, 1988, and the partial transcript thereof filed on August 26, 1988 pursuant to order of even date therewith.

AND IT IS SO ORDERED.