**In re SPOOR–WESTON, INC., Debtor.**

**In re Leslie G. WESTON and Cornelia Spoor–Weston, Debtors.**

**No. 90–00676–W.**

United States Bankruptcy Court, N.D. Oklahoma.

May 4, 1992.

**1010**

Brian W. Huckabee, Tulsa, Okl., for debtors.

Scott P. Kirtley, Tulsa, Okl., trustee.

ORDER GRANTING IN PART AND DENYING IN PART "OBJECTION TO CLAIMED EXEMPTION ON HOMESTEAD"

MICKEY DAN WILSON, Bankruptcy Judge.

On April 7, 1992, the objection by Snelling & Snelling and the Trustee to debtors' claim of exemption of homestead was submitted for decision on stipulations and briefs. Upon consideration thereof, and of the record herein, the Court, pursuant to F.R.B.P. 7052 and 9014, finds, concludes, and orders as follows.

### FINDINGS OF FACT

Leslie G. Weston and Cornelia Spoor–Weston ("Mr. Weston;" "Mrs. Spoor–Weston;" "debtors") managed employment agencies through debtors' close corporation, Spoor–Weston, Inc. Debtors and Spoor–Weston, Inc. operated under franchise from Snelling & Snelling, Inc. ("Snelling"). Disputes between franchisor and franchisees led to Snelling's attempt to terminate the franchises and enforce non-competition provisions therein, threatening to drive debtors and Spoor–Weston, Inc. completely out of business.

On or about March 15, 1990, debtors consulted an attorney, namely Timothy Trump ("Trump") of the law firm of Comfort, Lipe & Green, "for financial and bankruptcy advi[c]e," stips. ¶ 2. A petition for relief under 11 U.S.C. Chapter 11 and associated documents, including statement of financial affairs and schedules of debts and assets, were prepared by Trump's office and signed by debtors on March 16, 1990.

Mrs. Spoor–Weston maintained a Cash Management Account at Merrill Lynch. Debtors jointly owned a home at 8625 Gary Drive, Tulsa, Oklahoma, valued at "$90,-000.00–$98,500.00," stips. ¶ 19, subject to a mortgage in favor of Local America Bank of Tulsa ("Local Bank") securing a debt in the amount of approximately $70,373.86, stips. ¶ 18. On March 16, 1990, the same day the bankruptcy schedules were signed, " ... [Mrs. Spoor–Weston] withdrew $36,-402.15 from her Cash Management Account at Merrill Lynch. This money was disbursed as follows:

(a) On March 16, 1990, [Mrs. Spoor–Weston] deposited $34,493.00 in her personal account at Commercial National Bank.

(b) On March 16, 1990, [Mrs. Spoor–Weston] deposited $7,500.00 in the Spoor–Weston, Inc. corporate account. These funds were then paid to ... Trump as follows: $2,000.00 current bill, $500.00 filing fee and $5,000.00 to file a Ch. 11 petition.

(c) On March 16, 1990, [Mrs. Spoor–Weston] gave a $5,500.00 check to [Mr. Weston] who deposited this money in his personal account at [Local Bank]. These funds were then paid to ... Trump to file a Chapter 11 petition.

(d) The sum of $3,493.00 was deposited in the Debtor-in-Possession bank account on March 19, 1990. The sum of $1,909.15 was deposited in the Debtor-in-Possession bank account on March 27, 1990.

(e) On March 16, 1990, the sum of $21,-000 was paid to [Local Bank] in reduction of the principal note amount.

"... The funds disbursed [as described immediately above] were not exempt assets, at least not [before] their payment to the mortgage[e]," stips. ¶¶ 4, 5.

"... The payment to [Local Bank] was made by the Debtors upon the advi[c]e of counsel, [Mr.] Trump.

"... Trump advised the Debtors to make the payment to [Local Bank] for the following reasons: To create additional equity in the homestead which could be accessed by a post-bankruptcy second mortgage for funds to comply with the absolute priority rule if necessary to get a Chapter 11 plan confirmed; to maximize their exemptions; and to reduce their monthly mortgage payment thereby reducing their monthly expenses," stips. ¶¶ 6, 7.

"... The Debtors contend that ... Trump never advised them, and they did not know, that there was a risk that their mortgage payment might be considered fraudulent or their exemption contested," stips. ¶ 9.

"... The $21,000 payment to [Local Bank] was not disclosed on the Debtors' initial schedules filed on March 19, 1990 ... which the Debtors claim was due to the inadvertent omission of ... Trump or his staff.

"... The Debtors intended for ... Trump to disclose the payment on the initial schedules but signed the schedules without noticing the omission.

"... The $21,000 payment to [Local Bank] was disclosed by the Debtors on their Initial Report filed on March 29, 1990.

"... The Debtors and ... Trump were first informed that the $21,000 payment to [Local Bank] was not disclosed on their initial schedules at the Debtors' First Meeting of Creditors on April 12, 1990 by the attorney for Snelling ... On August 21, 1990 the Debtors amended their Statement of Financial Affairs to show the payment.

"... [Local Bank] had not required the $21,000 payment of principal.

"... The normal monthly note payments to [Local Bank] were not in arrears.

"... [Before] the $21,000 payment to [Local Bank], the Debtors only paid the normal monthly note payment," stips. ¶¶ 11–17.

"... The Debtors have no non-exempt assets," stips. ¶ 20.

Debtors' schedules reported assets of a total value of $193,200.00; and priority unsecured claims of $56,570.23, general unsecured claims of $44,199.24, and secured claims of $136,000.00, for total debt of $236,769.47, stips. ¶¶ 21, 22. Debtors claimed exempt, among other things, their homestead located at 8625 Gary Drive in Tulsa, Oklahoma.

On March 19, 1990, debtors and Spoor–Weston, Inc. filed their respective voluntary petitions for relief under 11 U.S.C. Chapter 11 in this Court. On the same day, debtors and Spoor–Weston, Inc. moved to reject their franchise and non-competition agreements with Snelling pursuant to 11 U.S.C. § 365(a). There followed an eighteen-month struggle between debtors and Snelling in the arena of Ch. 11. An incident in this struggle involved debtors' claim of exemption.

The meeting of creditors was convened on March 12, 1990, but was not concluded until January 11, 1991. Before its conclusion, on January 8, 1991, Snelling filed its "Objection to Claimed Exemption of Homestead." Snelling asserted that debtors' conversion of non-exempt money into exempt homestead equity was "inequitable and improper," and "under the principles of law and equity" the claim of homestead exemption "should be disallowed in its entirety, or in sufficient sum to prevent manifest injustice in this case," obj. pp. 2, 3. The matter was set for hearing on February 14, 1991; but the hearing was then stricken on joint request of debtors and Snelling, to be reset on application.

On August 10, 1991, debtors and Spoor–Weston, Inc. voluntarily converted their cases from Ch. 11 to Ch. 7. On September 10, 1991, the United States Trustee appointed Scott P. Kirtley as Trustee of the Ch. 7 cases ("the Trustee"). On October 30, 1991, the Trustee requested a scheduling order as to Snelling's pending objection to debtors' claim of homestead exemption.

On November 8, 1991, the Court allowed Trump and Comfort, Lipe & Green to withdraw as counsel for debtors.

On April 2, 1992, debtors, now represented by Brian W. Huckabee of Huckabee & Barnes, Inc., filed their "Brief in Support of ... Homestead Exemption." On April 6, 1992, the Trustee filed his "Trial Brief" in opposition thereto. Also on April 6, 1992, the debtors and the Trustee filed their joint "Stipulations" of fact. At hearing on April 7, 1992, the parties submitted the matter for decision on stipulations and briefs; and the Court thereupon took the matter under advisement.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (H), (J), (K), (O), 11 U.S.C. §§ 105, 522, 548, 727.

There are two main legal issues in this contested matter: first, whether debtors have done anything "wrong" or actionable at all; second, if debtors have done wrong, what remedy is appropriate.

Mrs. Spoor–Weston withdrew $36,402.15 from her Cash Management Account. Of this sum, $15,402.15 was applied to court costs and attorney fees, or consumed in post-petition operations of debtors' business. If this $15,402.15 had remained in the account, it would later have been paid out in any event, as priority administrative expenses to the Clerk, to debtors' attorney, and to post-petition creditors. Debtors' disposition of these funds was harmless, and need not be further considered here. The real problem is debtors' payment of the balance of $21,000 to reduce the mortgage debt on their homestead.

The problem must be seen in perspective. "[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity," *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230, 1233 (1934). Their special function is to use equitable means such as receivership (property of the estate, claims) and injunction (discharge) to reconcile payment of just debts with relief of honest but unfortunate debtors. Bankruptcy statutes "regularize" the practice of these specialized courts of equity, *In re First Security Mortgage Co., Inc.,* 117 B.R. 1001, 1008 (B.C., N.D.Okla.1990), but presumably do not defy equity itself. "[W]e cannot assume that Congress has disregarded well settled principles of equity ... Good sense and legal tradition alike enjoin that an enactment of Congress dealing with bankruptcy should be read in harmony with the existing system of equity jurisprudence of which it is a part," *Securities & Exchange Comm. v. United States Realty & Improvement Co.,* 310 U.S. 434, 457, 60 S.Ct. 1044, 1054, 84 L.Ed. 1293, 1304 (1940). Hence bankruptcy statutes should not readily be interpreted so as to require or permit an unfair, inequitable and unconscionable result. It is not always easy to reconcile the conflicting interests of creditors and debtors; bankruptcy courts are given a hard job in hard cases and must often make hard decisions. But "hard" should not mean "unfair, inequitable, unconscionable." Bankruptcy courts must often choose among competing equities; but weighing equities does not mean rejecting equity. Bankruptcy courts must keep in mind their essential duty to follow applicable law and also to achieve equity in their decisions. Congress itself expects no less of the courts which it created and empowered to further its own benign policies. Congress codified the equitable powers of bankruptcy courts at least in part in 11 U.S.C. § 105; but it must be remembered that bankruptcy courts are "inherently" possessed of equitable powers which are inseparable from such courts' basic functions.

The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done,

*Pepper v. Litton,* 308 U.S. 295, 304–305, 60 S.Ct. 238, 244, 84 L.Ed. 281, 288 (1939). To this end, a bankruptcy court "may in its discretion in the exercise of the jurisdiction

committed to it grant or deny relief upon performance of a condition which will safeguard the public interest," *Securities & Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. at pp. 455, 60 S.Ct. at pp. 1053, 84 L.Ed. at pp. 1303–1304.

Reconciling payment of just debts with relief of honest but unfortunate debtors is especially hard where debtors' exempt property is concerned. In theory, debtors should surrender their property for equitable distribution among their creditors—this is "the price of discharge," *In re Helmuth*, 92 B.R. 494, 497 (B.C., N.D.Okla.1988). It is agreed in principle among all States and as a long-standing feature of bankruptcy law that debtors need not surrender literally all of their property—rather, some decent measure of essential property, such as home and personal effects, should be exempted from execution or the claims of unsecured creditors, and only the non-exempt remainder of debtors' property surrendered for liquidation and distribution to such creditors. Thus a balance is struck between the rights of creditors and the dignity and well-being of debtors. It is not clear exactly how the balance should be struck—what items of property, or of what value, should be exempt; and what effect debtors' own misbehavior may have on their opportunity to claim exemption of property. The difficulty is especially acute in bankruptcy law, where exemption is not merely an incident to execution (as in State law) but functions together with other bankruptcy laws to set "the price of discharge." A bankruptcy discharge is an injunction, 11 U.S.C. § 524(a)(2), (3); and an injunction is an equitable remedy which is supposed to be equitable in its effect, 42 AM.JUR.2D (1969) "Injunctions" §§ 2, 23–26, 35–36, 38. Whether the bankruptcy discharge-injunction is fair depends in part on whether bankruptcy exemptions are fair—whether "the price of discharge" is a fair price.

Prices can be manipulated. In bankruptcy, the price of discharge can be manipulated by so-called "bankruptcy planning," whereby debtors deliberately concentrate their wealth in nominally exempt property, to leave as little as possible for distribution to creditors and to secure the full benefit of discharge at a bargain-basement price. Where exemptions are narrow and specific, there is little room for such maneuvering; but where exemptions are generous and open-ended, it is possible to move thousands of dollars worth of value under the shelter of nominal exemption for the duration of a bankruptcy case, and then move it out again when the coast is clear of creditors. Bankruptcy courts must decide whether or to what extent such antics will be tolerated.

Bankruptcy courts in Oklahoma must use Oklahoma State law exemptions for bankruptcy purposes, 11 U.S.C. § 522(b), 31 O.S. § 1(B). Oklahoma exemptions are traditionally generous and open-ended—although their abuse in bankruptcy has recently forced the Oklahoma Legislature to narrow some of them, see *In re Helmuth*, 92 B.R. at pp. 498–500, concerning 31 O.S. § 1(A)(5), (6). The Oklahoma homestead exemption, 31 O.S. § 1(A)(1), § 2, remains generous and open-ended, and therefore capable of both good use and great abuse. The Oklahoma Legislature created the exemption, but it is up to the courts to administer it properly. Oklahoma State courts have developed means of preventing abuse of the homestead exemption which are sufficient for State purposes, see *In re Shields*, 85 B.R. 582 (B.C., N.D.Okla.1988). In bankruptcy, as noted above, there are some additional difficulties. Oklahoma State law does not reach the use of the homestead exemption in "bankruptcy planning." Oklahoma State courts do not have to worry about the combination of exemptions and discharge.

The Bankruptcy Code does not deal specifically with "bankruptcy planning." 11 U.S.C. § 522 provides for bankruptcy exemptions, without specific mention of "bankruptcy planning" § 522(*l*) recognizes that claims of exemption may be objected to, but specifies no particular grounds of objection. 11 U.S.C. § 101(54) defines "transfer" as "every mode ... of disposing of ... property or with an interest in property," which might include conversion of property from one type to another, and

from non-exempt to exempt status. 11 U.S.C. § 548 provides for avoidance of transfers which were fraudulent as to creditors, without specific mention of conversion of property from non-exempt to exempt. 11 U.S.C. § 707 permits dismissal of a case, under subsection (a) "for cause" or under subsection (b) as "a substantial abuse of the provisions of [Ch. 7]." "Cause" or "substantial abuse" might consist of misuse of exemptions, *In re Higginbotham*, 111 B.R. 955, 964 (B.C., N.D.Okl.1990). 11 U.S.C. § 727(a)(2) provides for denial of discharge of a debtor who has transferred property with actual intent to hinder, delay or defraud creditors. § 727(a)(2) makes no specific mention of conversion of property from non-exempt to exempt; but the statute can reach such conduct, *In re Carey*, 938 F.2d 1073, 1076–1077 (10th Cir.1991). From these statutes, it may transparently appear that debtors may make transfers converting non-exempt property to exempt property, and may claim exemption even of such converted property; but claims of exemption may be objected to, or such transfers may be avoided, or debtors' cases dismissed, or debtors' discharges denied, if the conversion to exempt property was fraudulent under the circumstances.

Legislative history of 11 U.S.C. § 522 remarks that

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. *See Hearings*, pt. 3, at 1355–58. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law,

H.Rep. No. 95–595 (1977) pp. 1, 361, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6317. This remark in a committee report has sometimes been cited as proof of Congressional intent to allow bankruptcy planning no matter how inequitable it may be under the circumstances. In fact, the "Hearings" referred to in the committee report consist of a letter from Bankruptcy Judge Phelps and comments thereon by committee members and witnesses, condemning bankruptcy planning in the strongest terms; see *Hearings on H.R. 31 and H.R. 32 before the Subcommittee on Civil & Constitutional Rights of the Committee on the Judiciary*, 94th Cong., 2nd Sess. (1976). Judge Phelps' letter states that case law on the subject of bankruptcy planning "is in a state of utter confusion;" notes "that the conversion of non-exempt assets into exempt assets on the eve of bankruptcy is not, standing alone, fraudulent," and "that the payment of regular monthly payments on a debtor's homestead ... or various such payments in the usual manner of living of the bankrupt, are perfectly appropriate;" but damns "the deliberate enlargement of exemptions out of the usual and customary manner of living and in contemplation of bankruptcy" as "cheating" which "shocks one's conscience" and "bring[s] the whole bankruptcy process into disrepute." Judge Phelps observed, "To have the bankrupt form the decision that he will file ... bankruptcy proceedings and thereafter, with guidance from his attorney, to convert his salable assets into cash and then use that cash in such a way as to hide it from his creditors, even while his attorney is busy typing up the bankruptcy schedules, appears to me to be fraudulent." Judge Phelps used the word "hide" to mean "shelter," not "conceal;" for he offered an example illustrated by a debtor's own statement of affairs. Bankruptcy Judge Cyr agreed, declaring that such conduct by debtors is "outrageous" and is especially to be feared as exemptions become more generous. Thus, here is scant support for the notion that bankruptcy planning was approved without reservation by Congress! In fact, the notorious committee report seems to have been merely an artless paraphrase of Judge Phelps' letter; and the sense of the committee should be sought in the letter. That letter pointed out that the conversion of non-exempt property into exempt property in the ordinary course of the debtor's affairs may be innocuous. But the letter also insisted that the deliberate conversion of substantial non-exempt property into exempt property in contemplation of bankruptcy

was fraudulent and abusive and ought not to be tolerated. Judge Phelps' letter also made it clear that advice of counsel is no excuse for such conduct, but rather may be considered part of the essence of the offense.

The House committee's paraphrase of Judge Phelps' letter was repeated in the Senate committee report drawn up some months later, Klee, "Legislative History of the New Bankruptcy Code," 54 *A.B.L.J.* (Summer 1990) 275, 285, 287ff. In the Senate version, the explanatory reference to "Hearings" in the other chamber was unfortunately deleted, S.Rep.No. 95–989 (1978) pp. 1, 76, U.S. Code Cong. & Admin. News 1978, pp. 5787, 5862. For some reason, courts have too often quoted the edited and doubly-misleading Senate version. If legislative history is to be used, it must be used carefully, with due regard for its nature and failings. The *complete* legislative history of the Code indicates that conversion of non-exempt property into exempt property should be permitted only within limits—and outright bankruptcy planning exceeds those limits and should not be permitted. This view of the legislative history is also in accord with the language of the Code and with the usages of equity.

Given that conversion of non-exempt assets into exempt assets outside the usual course of business and on the eve of bankruptcy is wrong, the question becomes, how should this wrong be remedied?

Judges Phelps and Cyr noted that the Bankruptcy Act contained no specific remedy for bankruptcy planning, and suggested that a specific remedy should be provided by the new Bankruptcy Code. But the Bankruptcy Code was enacted without any specific provisions regarding bankruptcy planning. Some might infer that bankruptcy planning, no matter how wrong, is a wrong without a remedy. Such negative inference is unwarranted, for two reasons. First, it makes too much of what Congress did not say, while ignoring what Congress did say. The Code does not *specifically* refer to conversions of non-exempt property to exempt property—but it does not

specifically refer to *any* particular means of making transfers in defraud of creditors. The language of statutes such as 11 U.S.C. §§ 548, 707, 727 is general, but is quite plain enough to encompass a host of specific examples of wrongful conduct. If the general language of these statutes would encompass conversion of non-exempt property to exempt property with fraudulent intent, there is no need for a more specific statute, unless perhaps to specifically *except* bankruptcy planning from the general statutes. No such specific exception appears in the Code. Second, it ignores the general powers of the Bankruptcy Court. One of equity's fundamental maxims is, "no wrong without a remedy." The equitable powers of a bankruptcy court, whether codified in 11 U.S.C. § 105 or "inherent," may be relied on to supply any remedy necessary or appropriate to carry out the provisions of the Code, and to prevent fraud or injustice and safeguard the public interest.

Possible remedies include avoidance of the conversion to exempt property as a fraudulent transfer, dismissal for "cause" or "substantial abuse," denial of discharge, and objection to claim of exemption. Each of these remedies may have its own special requirements, differing in some details from the other remedies—for example, avoidance of transfer as "fraudulent" under 11 U.S.C. § 548(a)(2)(A), (a)(B)(i), (ii) may not require actual wrongful intent; but denial of discharge under 11 U.S.C. § 727(a)(2) certainly does. The creditor and Trustee in this case have chosen, not to attempt to avoid the conversion as a fraudulent transfer under 11 U.S.C. § 548, or to dismiss the case under § 707, or to deny debtors' discharge under § 727, but to object to debtors' claim of exemption under § 522.

Normally, objection to claim of exemption concerns the basic right to or measure of an exemption under the law creating the exemption—in this instance, a matter of State statutory law. But in abnormal circumstances, objection to exemption might concern the abuse of an exemption in the context of a bankruptcy case—a matter purely of bankruptcy law, which encom-

passes equity. It must appear that the debtor's hands are unclean; that, even in the peculiar context of a bankruptcy case, the debtor is not doing such equity as would entitle him to receive equity—that debtor has converted non-exempt property to exempt property, not in the ordinary course of debtor's affairs or for other reasons unconnected with bankruptcy, but outside the ordinary course of debtor's affairs, on special occasion or in unusual amount, deliberately enlarging his exemptions in contemplation of bankruptcy—that debtor has acted in a way that distorts the combined operations of bankruptcy receivership and injunction, offends bankruptcy policy, abuses the jurisdiction of the Bankruptcy Court, threatens the public interest, and may be described as unconscionable, outrageous, disreputable, or shocking to one's conscience. The classic example would "have the [debtor] ... with guidance from his attorney ... convert his [non-exempt] assets into cash and then use that cash in such a way as to [shelter] it from his creditors, even while his attorney is busy typing up the bankruptcy schedules." But of course there must be no casual interference with exemptions prescribed by the legislature; so a strong showing of abuse, sufficient to invoke the court's general equitable powers, must be required.

Accord, *Mickelson v. Anderson*, 31 B.R. 635 (B.C., D.Minn.1982); *In re Butts*, 45 B.R. 34 (B.C., D.N.Dak.1984). Compare *In re Carey*, supra (grant of discharge affirmed as not clearly erroneous; but held that, in an action under 11 U.S.C. § 727(a)(2), fraudulent intent warranting denial of discharge may be inferred where debtor conceals prebankruptcy conversions, converts assets immediately before filing bankruptcy, gratuitously transfers property, continues to use transferred property, or transfers property to family members, especially where the property has considerable monetary value); *In re Mueller*, 867 F.2d 568 (10th Cir.1989) (exemption denied as fraudulent transfer).

The recent Supreme Court decision in *Taylor v. Freeland & Kronz*, —— U.S. ——, 112 S.Ct. 1644, 118 L.Ed.2d 280 (U.S., 1992), holding that a trustee may not contest the validity of a claimed exemption after the time to do so has expired, even though the debtor had no colorable basis for claiming the exemption, also does not apply here. That decision concerned only the reading of F.R.B.P. 4003(b) and expressly did not reach the Bankruptcy Court's powers under 11 U.S.C. § 105.

In the case now before this Court, debtors converted a sizeable non-exempt asset (proceeds of a checking account in the amount of $21,000) into an exempt asset (equity in their homestead), not in any kind of a "normal" transaction, but on their attorney's advice, for the admitted purpose of removing the property from the reach of creditors in Ch. 11, on the very day that their bankruptcy petition and schedules were signed. This left no non-exempt assets available for distribution to creditors, and reduced "the price of discharge" to zero. Debtors acted on advice of counsel and deliberately concealed nothing; but these factors (whatever their importance may be under 11 U.S.C. § 727) are of little import here.

These facts would be enough to show impermissible bankruptcy planning in an ordinary Ch. 7 case. This case is complicated by the fact that it began in Ch. 11.

Debtors argue that their action on advice of their attorney was motivated in part by a desire "to have sufficient funds to comply with the absolute priority rule," debtors' brief p. 2. Debtors refer to 11 U.S.C. § 1129(b), nicknamed "cram-down," and in particular to the requirements of § 1129(b)(2)(B), (C), codifying in part the so-called "absolute priority rule," and the "new value exception" thereto established by *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). That is, debtors say they intended to create a reserve of equity in their homestead against which they could later borrow to obtain funds that would be paid into their projected Ch. 11 plan to satisfy the new value exception to the absolute priority rule. Debtors would seem to be contributing "new value" to the estate to help it reorganize; but the "new value" would come from funds that should have been

non-exempt property of the estate in the first place. Said another way, debtors intended to finesse their way through cramdown by paying the estate its own money. This does nothing to shift the equities in this matter in debtors' favor. Moreover, if debtors really intended to give the value of their homestead equity back to their creditors, they should have no objection to giving it back to them now.

Debtors further argue that their action on advice of their attorney was motivated in part by a desire to "reduce the monthly mortgage payment, thereby reducing their mont[h]ly expenses," which "would assist them in living within the tighter budget required by the Chapter 11," debtors' brief p. 2. This argument might have some force in a case under Ch. 13, where reduction of the monthly amount of a home mortgage payment by the Ch. 13 plan is forbidden, 11 U.S.C. § 1322(a)(2). But it has no force in a case under Ch. 11, where reduction of the monthly amount of mortgage payments of all types by the Ch. 11 plan is permitted and commonly practiced—and, indeed, is often the main objective in filing Ch. 11 in the first place. Debtors might have reduced their monthly payments to the extent necessary to reorganize and forced their home mortgagee to accept the reduction; they did not have to "economize" at the expense of all their other creditors. In any event, there is no evidence before the court that any reduction in the monthly payment on the homestead mortgage has been requested, allowed or accomplished by the debtors.

In this instance, complete denial of debtors' claim of exemption is unnecessary. The Court "may in its discretion ... grant ... relief upon the performance of a condition which will safeguard the public interest," *Securities & Exchange Comm. v. United States Realty & Improvement Co.,* supra. Here, the equities of the case and the public interest in fair and non-fraudulent bankruptcy proceedings do not require complete denial of debtors' claim of exemption; they are sufficiently served by granting the Trustee an equitable lien on debtors' homestead to secure payment of the sum of $21,000. Accord, *In re Mickelson,* supra.

Accordingly, the objection by Snelling and the Trustee to debtors' claim of homestead exemption is granted in part and denied in part, as follows: the Trustee is granted an equitable lien on the property claimed exempt by debtors as their homestead, to secure payment of $21,000 wrongfully diverted by debtors from the bankruptcy estate; debtors' claim of homestead exemption is granted, but debtors take their exemption subject to the Trustee's equitable lien. Debtors shall have three (3) months in which to repay the $21,000, before the Trustee may commence foreclosure of his lien.

AND IT IS SO ORDERED.