**In re Erhan OZEY, Debtor.**

**Bankruptcy No. 93–04157–W.**

United States Bankruptcy Court,
N.D. Oklahoma.

Aug. 8, 1994.

---

Joseph Q. Adams, Trustee, Catoosa, OK.

Phyllis DeWitt, Tulsa, OK, for Margaret Keeling.

J. Philip Adamson, Tulsa, OK, for Erhan Ozey.

### *ORDER DENYING OBJECTIONS TO DEBTOR'S HOMESTEAD EXEMPTION*

MICKEY DAN WILSON, Chief Judge.

The Trustee and various creditors object in part to debtor's claim of homestead exemption. Upon consideration of evidence received, of statements and arguments of counsel, and of the record herein, the Court, pursuant to F.R.B.P. 9014 and 7052, now finds, concludes and orders as follows.

### *FINDINGS OF FACT*

Erhan Ozey ("Ozey;" "debtor") is an American citizen of Turkish extraction. He is trained as an engineer, but at all times relevant hereto he has conducted himself as a businessman. As a businessman, Ozey utilized three major assets: first, his own international contacts; second, the financial resources of his mother, Necla Ozey ("Necla");

and third, the financial resources of his former wife, Margaret Keeling ("Keeling"), and her father.

On January 14, 1992, Keeling and Ozey were granted a divorce. The divorce decree awarded Ozey all interest in and to three corporations named Atnas Resources, Inc. ("Atnas Inc."); Anatolia, Inc. ("Anatolia Inc."), which later changed its name to "Emstar USA" ("Emstar Inc."); and Ersan Resources, Inc. ("Ersan Inc."). The divorce decree required Ozey to maintain health insurance on his minor children by Keeling; and Ozey did so by paying insurance premiums via the corporate account of Anatolia/Emstar Inc.

Atnas Inc. had been in existence since 1986; its purpose was to conduct oil and gas exploration and related activities. Anatolia/Emstar Inc. had been in existence since 1988; its purpose was to import leather goods from Turkey and other countries and market them wholesale in the U.S.A. Ersan Inc.'s purpose was to hold title to a yacht, named "the Ersan," docked in Turkey (and later held to be worth from $500,000 to $800,-000). Of these three corporations, the most active business was carried on by Anatolia/Emstar Inc., i.e. the leather-importing business. Among Emstar Inc.'s employees was one Robin Hoel ("Robin").

In March 1992, Ozey, as principal of Atnas Inc., Anatolia/Emstar Inc., and Ersan Inc., caused these entities to rent office space in the Kensington Towers, a large office building in Tulsa, Oklahoma.

By August 1992, Anatolia/Emstar Inc.'s business had so far declined that Ozey let go all of its employees, save himself and Robin. By late 1992, Atnas Inc. and Anatolia/Emstar Inc. had ceased doing any new business (while Ersan Inc. had never done active business, and functioned merely as a holding company, although the yacht it held was of considerable value). Rent due on the Kensington Towers leases was paid by Ozey, from his individual funds or from funds contributed to him by his mother Necla.

On December 15, 1992, Ozey bought a house at 9910 South Sandusky Avenue, within the City of Tulsa, Oklahoma. The purchase price was $277,000.00. Ozey paid down $77,000.00 with funds received from his mother Necla, and borrowed the balance from Bank IV, to be repaid in installments of over $1,200 per month. At the time of the purchase, Ozey was a single man. On February 5, 1993, Ozey married Robin. Since February 5, 1993, Ozey, Robin, and Robin's daughter Amanda have resided in this house and have made it their home.

In March 1993, the corporate leases at Kensington Towers expired. They were not renewed. Corporate mail was redirected to a box at a commercial post office or mail drop named "The Mail Chute;" Ozey paid for this box and received some of his personal mail there too. Ozey transferred the business phone lines to his home, set up a telephone answering service which received Emstar Inc.'s calls, and returned such calls from his house. Ozey moved the corporate books and records (which were voluminous) and a copier and facsimile machine into his house. A bedroom in the house was converted to an office "work area." From here, Ozey continued to maintain corporate books and records; continued collecting or trying to collect corporate accounts receivable; and continued to manage litigation then ongoing concerning the corporations as well as Ozey individually. Meanwhile, State franchise taxes were paid and the companies remained in good corporate standing; corporate accounts were maintained; and health insurance premiums for Ozey's children by Keeling continued to be paid through Emstar Inc.'s corporate account.

On July 30, 1993, Ozey testified in continuing divorce litigation against Keeling before the Honorable Deborah H. Shallcross, Judge in the District Court in and for Tulsa County, Oklahoma. Ozey stated that "right now I work out of the house, my home;" that his mother Necla was sending him funds monthly to help him resume business; that he had several projects pending which had so far produced no income but which he hoped would make money in the near future; and that he continued to attempt oil and gas acquisitions and to do technical consulting through the only office he had at that time, located in his home.

Telephone records for late 1993—early 1994 show that Ozey used the corporate phone(s) located in his house to place calls to Turkey, Luxembourg, France, the United Kingdom, the ocean-going vessel "Crown Prince," Calgary and Ontario in Canada, the American States of California, Colorado, Florida, Illinois, Ohio, Mississippi, Nevada, New York, Texas and Virginia, the District of Columbia, and various locations within the State of Oklahoma; also used his facsimile machine; and incurred telephone charges of hundreds of dollars per month from December 1993 through February 1994. Ozey later testified to this Court that he used the telephone to keep in touch with his mother Necla in Turkey and in Florida on the "Crown Prince;" to trace funds forwarded to him by Necla via Luxembourg; to keep abreast of a lawsuit then pending in Norfolk, Virginia (which concerned Ersan Inc. and its yacht); and to pursue prospective business contacts and seek new employment.

On December 30, 1993, Ozey filed his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

In statements and schedules filed with his petition, Ozey described himself as a "self-employed retailer;" and reported his home address at 9910 South Sandusky Avenue for both his employer address and the business address of Atnas Inc., Emstar Inc. and Ersan Inc. In said statements and schedules, Ozey also estimated the current equity in his home at $82,240.96; and claimed the home entirely exempt as urban homestead under 11 U.S.C. § 522 adopting 31 O.S. § 1(A)(1), § 2.

Joseph Q. Adams was appointed as Trustee of Ozey's bankruptcy estate ("the Trustee"). The Trustee, Keeling and some other parties in interest objected in part to Ozey's claim of homestead exemption. No one disputes that Ozey's home at 9910 South Sandusky Avenue is his homestead; but the Trustee, Keeling and others argue that, under applicable Oklahoma law, Ozey's business activities conducted from his home limit his homestead exemption to only $5,000.00 in equity. This contested matter was heard in open court on March 31 and June 3, 1994, and thereafter was taken under advisement.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), 11 U.S.C. § 522.

The issue in this contested matter is the extent to which Okla. Constitution Art. XII § 1 and 31 O.S. § 1(A)(1), § 2 exempt an urban homestead from which the homesteader has conducted limited and temporary business activities.

For the legal background to this issue, see *In re Shields*, 85 B.R. 582 (B.C., N.D.Okl. 1988). However, *In re Shields* did not reach "the special case of urban homestead used both for residential and business purposes," *id.* p. 584. This "special case" is hereinafter called *the mixed-use homestead.*

█ The Oklahoma urban homestead exemptions are specified in the Oklahoma Constitution, Art. XII § 1, and in 31 O.S. § 2. The Constitutional provision is repeated almost verbatim in the statute. The statute reads in pertinent part as follows:

The homestead within any city or town, owned and occupied as a residence only, shall consist of not exceeding one (1) acre of land, to be selected by the owner: Provided, that the same shall not exceed in value the sum of Five Thousand Dollars ($5,000.00), and in no event shall the homestead be reduced to less than one-quarter (1/4) of an acre, without regard to value: And provided, further, that in case said homestead is used for both residence and business purposes, the homestead interests therein shall not exceed in value the sum of Five Thousand Dollars ($5,000.00): Provided, [etc.] . . .

On its face, this statute appears to provide that a "residence only" homesteader can exempt an irreducible minimum of one-quarter of an acre of his realty "without regard to value;" but a mixed-use homesteader can exempt only up to $5,000 in value, and has no right to keep any irreducible minimum of acreage.

Other evidence of legislative intent supports this reading of the statute.

Oklahoma rarely preserves legislative history. However, the Legislature's ap-

parent intent in drafting the "business purposes" language in the homestead exemption statute can be inferred by analyzing *DeFord v. Painter,* 3 Okla. 80, 88, 41 P. 96, 104 (1895), and by recognizing the consequent change of the statute.

In *Deford v. Painter,* the Oklahoma Territorial Supreme Court construed the then existing homestead exemption statute. That statute provide[d]: "Homestead in a city, town or village, consisting of a lot or lots, not to exceed one acre with the improvements thereon; provided, that the same shall be used for the purpose of a home for the family." 34 Stat. of Okla., *Exemptions,* § 2845 (1893) (repealed 1910), *cited in* 3 Okla. at 88, 41 P. at 104. In *DeFord* the debtor owned a building in the business district of Guthrie. The debtor lived in a portion of the second floor and rented the rest of the building to others. The Territorial Supreme Court granted a homestead exemption on the entire building. *DeFord v. Painter,* 3 Okl. at 88, 41 P. at 104, *reported in, In re Booth,* 18 F.Supp. 79, 80 (N.D.Okla.1937). The Territorial Supreme Court lamented that its holding did not have a just result, but noted that if the Territorial Legislature wanted to change the statute, it could. Significantly, in 1910 the [Oklahoma Constitution was adopted and the] statute was changed to include the "business purposes" language with its value limitation that remains in the present statute. Without question it was the *DeFord* case that prompted that change. *In re Booth,* 18 F.Supp. at 80–81.

Therefore, consistent with the apparent legislative intent ... the statute provides that when an Oklahoma homestead is used for both residence and business purposes there is no minimum quantitative limitation. Instead, there is only a dollar value limitation. *In re Booth,* 18 F.Supp. at 82; *Finerty v. First Nat'l Bank,* 92 Okla. [102,] 103–04, 218 P. [859,] 860–61 [1923]. This must be the proper construction of the statute; otherwise, there would have been no reason in 1910 for the Legislature to insert the "owned and occupied as a residence only" language, and the "both residence and business purposes" language,

*In re Rashid,* 97 B.R. 610, 614–615 (W.D.Okl. 1989).

"As a practical matter, [the mixed-use] homestead ... loses the minimum one-quarter acre size limitation of the [residence-only] homestead ...," *In re Rashid,* 97 B.R. p. 614. The mixed-use "exemption" is effectively a penalty, not a grant. In some circumstances, this penalty would serve a salutary purpose, namely to prevent abuse of the normal urban homestead exemption. Without the mixed-use penalty, for example,

> ... a debtor who lived in one unit of a thirty-unit apartment building on a quarter acre or less [could] exempt the entire building as homestead. That situation was obviously the mischief that the Oklahoma Legislature was specifically attempting to prevent in 1910 ...,

*id.* p. 615. But in less egregious circumstances, the mixed-use penalty is potentially "harsh," *id.* p. 614. Its harshness has been aggravated by the fact that the original reservation of $5,000 in value to the homesteader has never been increased after 1910; and after 84 years of inflation, what was once a fairly generous cash allowance has become minimal.

The working of the penalty depends on the meaning given to the undefined statutory phrase "used for ... business purposes."

> What constitutes a "business purpose" under the Oklahoma statute presents a perplexing problem. For example, courts may have to determine whether a business purpose is unexpectedly triggered if there is mere profit-seeking activity within the home ...,

*In re Rashid,* 97 B.R. p. 615. Does "business purpose" for purposes of 31 O.S. § 2 mean "any money-making activity, no matter how trivial, temporary, incidental, or insignificant," or does it mean "only some significant level of business activity"—and if so, what level, or how significant? The question "has far-reaching ramifications for debtors ...," *In re Rashid,* 97 B.R. p. 615 n. 4.

Caselaw is sparse. *DeFord v. Painter* has been legislatively overruled. *Finerty v. First Nat'l Bank* concerns a residence-only homestead and addresses the mixed-use homestead only in dicta. *In re Booth* asks

whether any business activity forfeits the entire homestead right, and answers that it does not; the case does not ask whether any particular level of business activity forfeits the residence-only homestead right. *In re Wineland*, 3 F.Supp. 796 (N.D.Okla.1933) resembles *Booth* (with the added complication that the realty claimed as homestead was leased). *In re Rashid* holds, strictly speaking, that land adjoining an urban home was abandoned as homestead when it was dedicated to the production of income; so that case's extensive comments on the mixed-use exemption are, strictly speaking, dicta. *In re Hughes*, 166 B.R. 957 (B.C., E.D.Okl.1994) is the only case after *DeFord* which addresses the issue squarely. *Hughes* concerned exemption of the house of a self-employed "concrete work[er]" who "receives and pays bills from his home," 166 B.R. pp. 958, 960. The court held that, in such circumstances, the house was not "used for ... business purposes" within the meaning of the statute, because to hold otherwise "would mean that when any debtor took work home from his office, his residence would be used for business purposes and thus, the homestead exemption would be destroyed," *id.* 166 B.R. p. 960.

■ Statutes granting exemptions "must be liberally construed to comport with the beneficent spirit that prompted their enactment," *In re Booth*, 18 F.Supp. p. 80. Oklahoma statutes in general are to be construed in such manner as tends to effect their purpose, *In re McKaskle*, 117 B.R. 671, 674 (B.C., N.D.Okl.1990). Nor should any part of a statute be given a construction which is absurd, unreasonable, oppressive, or manifestly at variance with the intent and purpose of the Legislature in enacting the statute as a whole, *Berry v. State ex rel. Oklahoma Public Employees Retirement System*, 768 P.2d 898 (Okl.1989); *In re Concer's Estate*, 271 P.2d 329 (Okl.1954).

■ The homestead exemption is the most urgent of all exemptions, the only one to be included in the Oklahoma Constitution, *In re Shields*, 85 B.R. p. 583. The lengths to which Oklahoma courts will go to protect the homestead exemption are shown in such recent cases as *State of Oklahoma ex rel.*

*Means v. Ten (10) Acres of Land*, 877 P.2d 597 (Okla.1994), *In re Martin*, 875 P.2d 417 (Okla.1994), and *Sanders v. Bingham*, 877 P.2d 627 (Okla.App.1994). The mixed-use "exemption" is really a restriction on exemption, whose purpose is to prevent abuse of the basic homestead right. This restriction or penalty should be construed together with the homestead exemption of which it is a part. The "beneficent purpose" of the exemption statute as a whole is reconciled with the mixed-use penalty by giving the penalty a narrow construction and application, so as to penalize only clear abuse of the basic homestead right. Instances of clear abuse of the basic homestead right include the actual facts presented in *DeFord v. Painter* and the "apartment building" hypothetical posed in *In re Rashid*. Such instances involve the following circumstances or factors: the realty is not in a residential district; it is not of ordinary residential type, i.e. is not a "home" in the usual sense; the realty itself serves as a source of income for its owner; much or most of its total value is attributable to its business, rather than its homestead, function; identifiable portions of the realty are clearly non-residential and "business" in character and/or in continuing use, and would not be exempt but for their association with other portions of the realty which are homestead in character; yet severance of the business and homestead portions to protect the latter is not practicable. In such extreme circumstances, granting the basic urban homestead exemption would allow the debtor to use his homestead right to shield undoubted business property from execution. It would have the (residential) tail wag the (business) dog.

■ On the other hand, "business purpose" must be construed to mean something more than mere "business activity" regardless of type or degree. It would be manifestly absurd, unreasonable, oppressive, and contrary to the beneficent intent of the homestead exemption overall, to destroy the basic urban homestead right whenever the slightest "business activity" is shown to occur in a debtor's house and home. It is a rare debtor who *never* takes work home, *never* makes or

takes business calls on his home telephone, *never* uses his kitchen table as a work-desk, (nowadays) *never* uses his home computer for anything but balancing his personal check-book, or otherwise *never* mixes his business and domestic affairs in the slightest degree. This Court does not believe that the Oklahoma Legislature ever intended that such minimal and/or incidental "business activity" should result in loss of the basic urban homestead right. "Mere profit-seeking activity within the home," *In re Rashid,* 97 B.R. p. 615, need not constitute such clear abuse of the basic homestead right as would justify application of the mixed-use penalty. Accord, *In re Hughes,* supra.

 Here, the realty is in a residential district, is of ordinary residential type, and would be recognized by anyone as a normal single-family home. The realty itself produces no income by rent or any other means. None of its total value is attributable to any business activities which Ozey conducts therein. No identifiable portion of this home is clearly non-residential and "business" in character, although an ordinary residential bedroom or "spare room" has been refurnished and used on an *ad hoc* basis for business activities. It cannot be said that such an ordinary residential bedroom or "spare room" would ordinarily be non-exempt but for its association with the rest of the house; rather, the whole house, including the bedroom or "spare room," would ordinarily be exempt as a unit. Nor is Ozey's business activity of a *continuing* nature. The use of the bedroom or "spare room" for business activities, or of telephones in the house to make and receive business calls, has occurred on a temporary, *ad hoc* basis, during an acute collapse of Ozey's ordinary business activities, and is expected to continue only until Ozey's ordinary business activities resume. Such business activities as Ozey has conducted from his home have involved the mere winding up of his former business and the search for new employment. Such business use has been *de minimis* and strictly incidental to the normal functioning of the undoubted homestead. In no way is Ozey using his homestead exemption to shield undoubted business property from his creditors. The Court does not condone the purchase of a $277,000 home, to be paid for at over $1,200 per month, at a time when Ozey's businesses had already failed; but the home, though luxurious, was and remains entirely a *home;* and no question of "bankruptcy planning" is raised—compare *In re Spoor-Weston, Inc.,* 139 B.R. 1009 (B.C., N.D.Okl.1992). In these circumstances, exemption of the whole realty as homestead is not an abuse; and enforcement of the mixed-use penalty is not appropriate.

The Court concludes that the homestead property herein is not "used for . . . business purposes" within the intended meaning of 31 O.S. § 2. Accordingly, the objections to Ozey's claim of homestead exemption are hereby denied, and Ozey's claim of homestead exemption is hereby granted and allowed.

AND IT IS SO ORDERED.