**In re David Wayne STARKEY, d/b/a Green Acres Exotics, Debtor.**

**Bankruptcy No. 94–03760–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Feb. 21, 1995.

Kenneth Todd, Tulsa, OK, for debtor.

Patrick Malloy, III, Trustee, Tulsa, OK.

***ORDER DENYING DEBTOR'S "EMER-GENCY APPLICATION FOR A STAY OF EXECUTION ON THE ORDER GRANTING TRUSTEE'S MOTION TO REJECT EXECUTORY CONTRACTS . . ."***

MICKEY DAN WILSON, Chief Judge.

On February 16, 1995, there came on for hearing the debtor's "Emergency Application

for a Stay of Execution on the Order Granting Trustee's Motion to Reject Executory Contracts ..." After hearing statements of counsel, the Court recited its determinations, conclusions and order(s) into the record, which said recitations are adopted and incorporated herein by reference. Pursuant to F.R.B.P. 7052, 9014 adopting F.R.Civ.P. 52, the Court hereby memorializes and supplements said recitations as follows.

This Court has received evidence and made findings in several previous hearings in this case and has stated findings in previous orders, most recently in its "Order Denying Debtor's 'Motion to Reconsider ...'" filed February 13, 1995. Some of these findings are restated herein for the sake of clarity and completeness of the present order.

David Wayne Starkey ("Starkey") did business with his brother Jerry under the name Green Acres Exotics ("Green Acres"). Green Acres is an "ostrich ranch"—a facility for housing, breeding and raising exotic animals, mostly ostriches and emus ("ratites"), but also including Boer goats and hedgehogs. Green Acres' equipment is elaborate and expensive. The animals are owned primarily by other parties ("investors"); Starkey looked after the animals in return for a minority share in their ownership, which would be realized in money if and when the animals were sold. Typically, an investor's interest in an animal or breeding group was 75%; Starkey's interest was 25%. These business arrangements are referred to herein as "the contracts."

On December 19, 1994, Starkey filed his voluntary petition for relief under 11 U.S.C. Chapter 7 ("Ch. 7") in this Court. As usual in Ch. 7 cases, a Trustee was appointed, in this instance Patrick J. Malloy III ("the Trustee"). As usual in Ch. 7 cases, the Trustee began trying to manage and control property of the bankruptcy estate. The Trustee's efforts have been repeatedly obstructed by Starkey and his brother Jerry, who live in close proximity to Green Acres' business premises.

On January 9, 1995, Starkey by his then attorneys Cliff A. Stark and Robert G. Green ("Stark and Green") filed a "Motion to Dismiss" his own Ch. 7 case.

On January 13, 1995, the Trustee filed his "Motion ... for Order Authorizing Rejection of Executory Contracts and Directing Recovery of All Birds." This motion is hereinafter referred to as "the motion to reject." The investor contracts mentioned above were executory for purposes of 11 U.S.C. § 365, and pursuant thereto could be rejected in bankruptcy if they were uneconomic. Since taking possession of the Green Acres property as part of Starkey's bankruptcy estate, the Trustee has been faced with mounting costs of caring for the animals in a market in which the value of ratites is declining. Also, various incidents before and after commencement of the Ch. 7 case have caused some investors to lose confidence in Starkey and in his operation. The Trustee moved for permission to reject the contracts and have the investors retrieve their respective animals and place them elsewhere.

Also on January 13, 1995, the Trustee filed his "Motion ... for Order Directing David Starkey and Jerry Starkey Vacate Premises Occupied by the Estate." This motion is hereinafter referred to as "the motion to evict." The Trustee wanted the Starkeys evicted from their homes adjacent to Green Acres because of their continuing obstruction of the Trustee and his agents' administration of estate property.

Starkey's motion to dismiss, and the Trustee's motions to reject and to evict, were all set for hearing on February 3, 1995.

On January 13, 1995, this Court allowed Stark and Green to withdraw. At approximately the same time, Starkey engaged Kenneth V. Todd ("Todd"), who on January 25, 1995, entered his appearance as attorney of record for Starkey.

On February 3, 1995, the motions to dismiss, reject and evict came on for hearing, and after receipt of some evidence, were continued to February 6, 1995. On February 6, 1995, immediately before recommencement of hearing, Starkey by Todd filed a document titled "Motion/Notice to Convert This Case to a Chapter 12 Case." This is hereinafter referred to as "the motion to convert." The Court asked Todd in open court if this meant withdrawal or abandonment of the motion to

dismiss, and was told it did. The Court allowed withdrawal of the motion to dismiss, and gave the parties 20 days to respond to the motion to convert. However, the trial proceeded, since the Trustee's motions to reject and to evict were still pending.

The Trustee presented evidence of Starkey's filing of inaccurate and untrustworthy schedules in bankruptcy; of Starkey's repeated failure to obey the orders of a State court, a Federal magistrate in this District, and this Court, eventually requiring the intervention of Federal marshals; and of personal affronts offered by Starkey to attorneys acting as officers of this Court in this case. Starkey did not deny these events, but attempted to excuse them by presenting evidence that he suffers from a medical condition called Adult Attention Deficit Disorder (A.A.D.D.), whose symptoms allegedly include functional illiteracy, inability to focus attention, and poor memory. Starkey also presented evidence tending to show that Green Acres had been a well-run "farm"— although it should be noted that the main issue in this case has always been, not abuse of animals, but abuse of creditors.

Among the evidence received on February 3–6 was the testimony of two of Starkey's witnesses, Robert J. Smith, Jr. ("Smith") and Dr. Gary B. Wood, D.V.M. ("Wood"). Smith testified that he could continue to do business with Starkey; and Wood testified that Green Acres should be reorganized. But Wood also testified that the ratite market was in severe decline. Both men testified that their contracts with Starkey were no longer economically feasible; that these contracts would have to be renegotiated; and that the combination of contractual demands and further costs incurred by the Trustee in maintaining Green Acres was burdensome to investors as well as to the bankruptcy estate. Jerry Starkey's attorney made a statement to the Court to the same effect; and emphasized that the combination of rising costs and declining value made prompt action necessary to "stop the bleeding."

After trial, the Court denied the Trustee's motion to evict, not because of lack of proof of Starkey's irregular behavior, but because the penalty of eviction seemed uncalled-for as yet; and granted the Trustee's motion to reject, with instructions to have investors come get their property. A written order covering these matters was filed February 8, 1995. This order is referred to hereinafter as "the order rejecting." In said order, the Court acknowledged that "implementation of this Order of the Court would or may make conversion not feasible by virtue of the removal of the ratites and liquidation of other property of the estate," but noted that "[t]he filing of Debtor's motion/notice to convert this case does not stay or stop the execution of this Order," order rejecting p. 2.

The next day, February 9, 1995, Starkey filed his "Motion to Reconsider Order Granting Trustee's Motion to Reject Executory Contracts With Instructions." This motion is referred to hereinafter as "the motion to reconsider (the order rejecting)." The gist of the motion to reconsider was that "[t]he effect of the [order rejecting] is to strip the debtor's absolute right to convert his case to a chapter 12 case by virtue of 11 U.S.C. § 706(a) ...," motion to reconsider p. 1 ¶ 3.

On February 13, 1995, the Court issued its "Order Denying Debtor's 'Motion to Reconsider ... Order Granting Trustee's Motion to Reject ...'" This order is hereinafter referred to as "the order denying reconsideration (of the order rejecting)." This order stated that issues regarding conversion would come on in due time; that the immediate issue was reconsideration of the order rejecting (the executory contracts); that all evidence, including testimony of Starkey's own witnesses, indicated that the contracts must be rejected no matter what Chapter Starkey might be in; that no motion for stay of the order rejecting had been filed; that a request for stay was included in the motion to reconsider; that debtor offered no bond or other security for accruing costs during any stay; and that under such circumstances reconsideration should be denied forthwith and no stay should be granted.

The order denying reconsideration was issued on the morning of February 13, even as Todd filed an "Emergency Application for a Stay of Execution on the Order Granting Trustee's Motion to Reject ..." This document is hereinafter referred to as "the mo-

tion for stay (of the order rejecting)." This motion asked for stay of the order rejecting until the motion to convert was granted; and further proposed that the motion to convert must be granted, regardless of other considerations. After reading the motion for stay, the Court issued an "Order Granting Temporary Stay of Execution on Court's Order Rejecting Executory Contract and ... Setting Hearing" of the motion for stay for February 16, 1995. This order is hereinafter referred to as "the temporary stay." The temporary stay countermands in part the immediately previous order denying reconsideration, which had held that no stay should be granted.

Of all the matters discussed above, the only one that came on for hearing on February 16 was Starkey's motion for stay (of the order rejecting). But the stay, the issue of rejection, and the motion to convert, have become intertwined, because Starkey's attorney Todd insists that conversion to Ch. 12 overrides everything else. The Court stated in its order denying reconsideration (of the order rejecting) that it intended to take up issues regarding conversion to Ch. 12 in due time, when the motion to convert came on for hearing. But the nature of Todd's arguments in moving for stay (of the order rejecting) forces the Court to address the subject of conversion in some detail here and now.

Todd proposes that Starkey has an "absolute right" to convert from Ch. 7 to Ch. 11, 12 or 13 (the latter three being referred to collectively hereinafter as "the plan chapters"); that such conversion should be effected immediately, either by "notice of conversion" or by perfunctory order granting motion to convert; and that anything short of immediate conversion is a denial of Constitutional rights. Todd asserts that Starkey's "absolute right" to convert from Ch. 7 to a plan chapter appears in the "unequivocal language" of 11 U.S.C. § 706(a), in its legislative history, and in caselaw, in particular the cases of *In re Martin,* 880 F.2d 857 (4th Circ.1989) (hereinafter "the *Martin* case"), *In re Finney,* 992 F.2d 43 (4th Circ.1993) (hereinafter "the *Finney* case"), *In re Calder,* 973 F.2d 862 (10th Circ.1992) (hereinafter "the *Calder* case"), and *In re Stegall* (unpub-

lished opinion, N.D.Olka. No. 92–C–246–B filed 9/18/92, 1992 WL 698764, reversing and remanding this Court's unpublished order, Case No. 90–00830–W filed 3/13/92) (hereinafter "the *Stegall* case"). Todd says that "This Court ... must convert this case to Chapter 12 ... Starkey must be given a chance to reorganize, and only if he commits fraud in the chapter 12 case, may the Court reconvert the same to a chapter 7 case," motion to reconsider p. 5 ¶ 21. This Court has previously ruled to the contrary in *In re Spencer* ("the *Spencer* case") and in its own unpublished opinion in *Stegall,* wherein this Court applied and extended the rule in *Spencer.* Todd asserts that he "has for a number of years, disagreed" with this Court's ruling in *Spencer,* motion for stay p. 2 ¶ 4; and he argues that such rule is erroneous and untenable.

This Court has carefully reviewed its own ruling in *Spencer* and the authorities cited by Todd. The Court concludes that neither the text nor legislative history of § 706 purport to grant a debtor in bankruptcy a truly "absolute right" to convert; that none of the cases cited by Todd—not *Martin,* or *Finney,* or *Calder,* or the District Court opinion in *Stegall*—has ever held that a debtor in bankruptcy has a truly "absolute right" to convert under § 706; that all these cases have held that conversion under § 706(a) may be refused in extreme circumstances; that there is at most some difference of opinion, or at least of expression, regarding how extreme the circumstances must be if conversion is to be refused; and that this Court's rulings in *Spencer* and *Stegall* are in fact modelled on *Martin,* closely comparable to *Finney,* entirely compatible with *Calder,* and in most respects compatible with the District Court's opinion in *Stegall.* Moreover, this Court's processing of the motion to convert is strictly in accordance with applicable rules, namely F.R.B.P. 1017(d) second sentence, 9013, and 2002(a)(5); there is no denial of any of Starkey's rights, Constitutional or otherwise.

■ A debtor in bankruptcy's right to convert from Ch. 7 to a case under another chapter is governed by 11 U.S.C. § 706. The issue which Todd brings before the Court is an issue of statutory interpretation. Statuto-

ry interpretation begins, of course, with the language of the statute.

§ 706(a) provides that

The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title *at any time,* if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable,

(emphasis added). "Waiver" means "the voluntary relinquishment of a known right." The last sentence of subsection (a) is meant to prevent frustration of the Bankruptcy Code by standard provisions in contracts of adhesion (comparable to waivers of exemption, see 11 U.S.C. § 522(e)). This sentence does not apply to any impairment of the right to convert for reasons of the debtor's own misconduct or comparable circumstances, more in the nature of estoppel than waiver. The idea of an "absolute right" to convert is derived from the first sentence's words "*at any time,*" which are supposed to mean, in effect, "regardless of circumstances."

■ This supposition is erroneous, for two reasons. First, the words "at any time" are not the words "regardless of circumstances." The words "at any time" refer literally to any stage in the progress of a case, not to any conditions which may develop during that progress, especially in an abnormal and abusive case. Second, statutory language must be read in context. Immediately after § 706(a) comes § 706(b), which reads as follows:

On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title *at any time,*

(emphasis added). The words "at any time" in § 706(b) surely cannot mean that the Bankruptcy Court can force a debtor into Ch. 11 whenever the Judge feels like it, "regardless of circumstances." If the Judge cannot force the debtor into Ch. 11 whenever he feels like it under § 706(b), then the debtor cannot force himself into Ch. 11, 12 or 13 whenever he feels like it under § 706(a). If the phrase "at any time" means "at any stage" but not "regardless of circumstances" in § 706(b), it should mean the same thing in

§ 706(a). The language of § 706, read as a whole, indicates that debtor certainly does *not* have any "absolute right" to convert regardless of circumstances.

The phrase "absolute right" comes, not from the statute, but from the statute's legislative history. The Senate committee's report on its version of proposed § 706(a) states as follows:

Subsection (a) of this section gives the debtor the one-time *absolute right* of conversion of a liquidation case to a reorganization or individual repayment plan case . . . The policy of the provision is that the debtor should *always* be given the opportunity to repay his debts . . . ,

S.Rep.No. 95–989, p. 94 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5880 (emphasis added). The Court is not asked to apply the statute literally; the Court is asked to read these committee comments into the statute and apply *these comments* literally.

■ There has been much ado about when or if legislative history should be considered as an aid to interpretation of a statute. But this Court is not aware of any rule that legislative history, when considered, must be taken literally. At best, legislative history is a clue to the meaning of a statute; it is not the only clue, or even the single most important clue; and its summary, nontechnical character must always be kept in mind.

■ Here, it is clear that the committee report's words "absolute right" and "always" were never meant to be taken literally. Having stated that the debtor's "right" is "absolute," the committee report's very next sentence acknowledges (as the language of the statute also clearly provides) that the "right" is not "absolute" and that "always" means *usually*—for "[i]f the case has already once been converted from chapter 11 or 13 to chapter 7, then the debtor does not have that right," S.Rep.No. 95–989, p. 94, U.S.Code Cong. & Admin. News 1978, p. 5880 (1977). At this point, the committee report specifically acknowledges only those circumstances which are also specified in § 706(a), i.e. "if the case has already once been converted . . ." But these are not the only restrictions on conversion. The statute itself, in subsec-

tion (d), goes on to provide that the debtor's "absolute right" is further restricted by 11 U.S.C. § 109's requirements of eligibility for a Chapter. This additional condition is acknowledged a few paragraphs later in the committee report on § 706(d). Most interesting are the committee's comments on § 706(b). The committee report says that

> Subsection (b) permits the court ... to convert the case to chapter 11 *at any time.* The decision whether to convert is left *in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest,*

S.Rep.No. 95–989 p. 94, U.S.Code Cong. & Admin.News 1978, p. 5880 (1977) (emphasis added). That is, according to the committee report, the words "at any time" do not preclude exercise of "the sound discretion of the court, based on what will most inure to the benefit of all parties in interest." If this is true of § 706(b), it should be true of § 706(a). The legislative history of § 706, read as a whole, indicates that debtor certainly does *not* have any "absolute right" to convert regardless of circumstances.

■■■ If the statutory language of § 706(a), (b) were taken alone, both subsections stating that conversion may occur "at any time," it would indicate that conversion under § 706(a) and (b) should be determined by closely similar standards. The legislative history indicates that Congress actually intended conversion at debtor's option under § 706(a) to be granted more readily than at creditors' request under § 706(b); but indicates also that Congress never meant the term "at any time" to prevent the Court from exercising some discretion, taking into account the interests of all concerned in order to guard against abuse.

■■■ In any event, specific acknowledgement of such basic conditions in statute or legislative history is not necessary. Congress does not have to add to each and every statutory subsection and committee comment thereon the proviso, "subject to bad faith and extreme circumstances." All courts have inherent power and duty to prevent abuse of their jurisdiction. Bankruptcy Courts, being courts of equity, are no exception. This Court has so held many times, in many con-

texts—See e.g. *In re Higginbotham,* 111 B.R. 955, 961 (B.C., N.D.Okl.1990); *In re First Security Mortgage Co., Inc.,* 117 B.R. 1001, 1008 (B.C., N.D.Okl.1990); *In re Spencer,* 137 B.R. 506, 511 (B.C., N.D.Okl. 1992); *In re Spoor–Weston, Inc.,* 139 B.R. 1009, 1012–1013 (B.C., N.D.Okl.1992).

■■■ The classic case under the former Bankruptcy Act was *Securities & Exchange Commission v. United States Realty & Improvement Co.,* 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940) (hereinafter "the *S.E.C.* case"). In that case, a debtor filed under Chapter XI. Debtor was eligible for Ch. XI and chose to file under that chapter; but debtor was forced to dismiss, in order to refile under Chapter X, because Ch. X was more appropriate for supervising debtor's operations and producing a fair and equitable plan. Mr. Justice Stone for the Supreme Court wrote that, whether or not specified by statute, "it was plainly the duty of the ... court [of bankruptcy] in the exercise of a sound discretion" to "grant or deny relief ... [or] even withhold relief altogether ... in the public interest ...," *id.* 310 U.S. p. 455, 60 S.Ct. p. 1053, 84 L.Ed. pp. 1303–1304. Mr. Justice Stone continued,

> While a bankruptcy court cannot, because of its own notions of equitable principles, refuse to award the relief which Congress has accorded the bankrupt, the real question is, what is the relief which Congress has accorded the bankrupt and is it more likely to be secured in a chapter X or chapter XI proceeding?

*Id.* 310 U.S. p. 457, 60 S.Ct. p. 1054, 84 L.Ed. p. 1304. Henceforth, as this Court has observed,

> [I]t was well established that, with or without specific statutory authorization, bankruptcy courts could dismiss or convert cases filed under inappropriate chapters, i.e., where relief under the chapter chosen by the debtor would be unnecessarily prejudicial to the rights and interests of creditors,

*In re Higginbotham,* 111 B.R. p. 961. The principle is readily extended to *refusing* dismissal or conversion. Either way, a Bankruptcy Court performs its duty to use its

sound discretion to prevent the debtor from choosing chapters in violation of public policy and in disregard of the legitimate interests of creditors.

 Nothing in the Bankruptcy Code in general or in § 706 in particular purports to remove this fundamental power and duty of the Court. It may be argued that two sentences in the Senate committee report, taken out of context and read literally, purport to do so. But

If legislative history is to be used, it must be used carefully, with due regard for its nature and failings,

*In re Spoor-Weston, Inc.,* 139 B.R. 1009, 1015 (B.C., N.D.Okl.1992).

[A]re all considerations of equity and judicial power and responsibility to be overturned by an ill-considered Committee report? The answer must surely be, "No,"

*In re Higginbotham,* 111 B.R. p. 963. If there is a conflict between the inherent judicial power of the Third Branch of government and mere semi-official remarks made by Congressional committees, then the judicial power must prevail.

 But this time there is no real conflict. When the legislative history is read as a whole, the two sentences no longer purport to infringe on basic judicial power and responsibility. The Senate committee report's use of the term "absolute right" is not absolute; and its qualified use of the term "at any time" reads much like Justice Stone's opinion in the *S.E.C.* case. Congress intended to encourage debtors' voluntary conversion from Ch. 7 to a plan chapter; Congress did not intend to encourage abuse of process.

 This Court respects, and has every intention of enforcing, the intent of Congress in *all* these respects. This Court will grant conversion under § 706(a) readily—but not so readily as to allow and condone abuse.

Todd cites the *Martin* case in support of a supposed "absolute right" to convert. In that case, the Bankruptcy Court denied debtor's motion under § 706(a) to convert from Ch. 7 to Ch. 13; the District Court reversed; and the Court of Appeals for the Fourth Circuit ("4th Circuit Court") affirmed. The 4th Circuit Court noted, at 880 F.2d p. 859

and n. 2, that some courts had allowed conversion in any circumstances except those specified in the text of § 706(a), citing *In re Kleber,* 81 B.R. 726 (B.C., N.D.Ga.1987), *In re Easley,* 72 B.R. 948 (B.C., M.D.Tenn. 1987), *In re Caldwell,* 67 B.R. 296 (B.C., E.D.Tenn.1986), *In re Street,* 55 B.R. 763 (BAP 9th Circ.1985), *In re Jennings,* 31 B.R. 378 (B.C., S.D.Ohio 1983); while others had refused conversion in extreme circumstances indicating minimal effort, infeasibility and bad faith, *In re Calder,* 93 B.R. 739 (B.C., D.Utah 1988), *In re Straugh,* 41 B.R. 757 (B.C., W.D.Penn.1984). The 4th Circuit Court perceived "unequivocal" and "absolute" language in § 706(a) and its legislative history, 880 F.2d pp. 858–859. The 4th Circuit Court supposed that the words "at any time" mean "regardless of circumstances," overlooked § 706(b), and erroneously stated that "the legislative history contains no contrary language indicating that Congress sought to restrict a debtor's right to convert ...," 880 F.2d p. 859. Nevertheless, the 4th Circuit Court *refused* to allow debtor an "absolute right" to convert. Instead, the 4th Circuit Court ruled that courts should "refuse to interfere with that right *in the absence of extreme circumstances,"* id. (emphasis added). The 4th Circuit Court did not remand, because it said there were no allegations of "facts which if true would provide an adequate ground to deny the debtor's motion to convert," *id.,* while the question of bad faith had been raised only in context of plan confirmation, and that question was "not properly before us," *id.* p. 860.

Todd cites the *Finney* case in support of a supposed "absolute right" to convert. In that case, after a well-deserved denial of discharge in Ch. 7, debtor moved under § 706(a) to convert to Ch. 11. The Bankruptcy Court (Bonney, J.) found debtor in "subjective bad faith" and refused conversion, invoking 11 U.S.C. § 105; the District Court reversed, holding that debtor's conduct in Ch. 7 was not "egregious" enough to warrant denial of conversion, 141 B.R. 94, 98 (E.D.Va.1992); and the 4th Circuit Court affirmed the District Court, 992 F.2d 43 (4th Circ.1993). The 4th Circuit Court omitted citing *Martin;* but it repeated *Martin's* anal-

ysis, with the same defects, and at first glance seemingly adopted *Martin's* rule. The 4th Circuit Court seemed to apply the rule with extraordinary leniency toward debtor. Said the court,

> We express no opinion on what circumstances, if any, would justify invocation of § 105(a) to deny a § 706(a) motion *outright*. We agree with the district court, however, that Finney's misconduct during the Chapter 7 proceedings was insufficiently "egregious" to warrant such extreme action,

992 F.2d p. 45 (emphasis added.) But what the District Court and 4th Circuit Court gave with one hand, they took back with the other. The District Court ruled that debtor had no right to *remain* in Ch. 11; that the Bankruptcy Court could dismiss the Ch. 11 or reconvert to Ch. 7 if it found that Ch. 11 proceedings were sought in subjective bad faith and were objectively futile; that these considerations could be addressed *even at the stage of the motion to convert*, so that it was not necessary to go through the technical charade of converting from 7 to 11 and then converting back again; and that the same circumstances of misconduct in Ch. 7, which did not justify refusing conversion "outright," could be considered as evidence of debtor's unfitness for Ch. 11. The District Court further

> held as a matter of law that a bankruptcy court may, in its discretion, deny a § 706(a) motion upon finding that immediate reconversion from Chapter 11 to Chapter 7 is appropriate under § 1112(b),

992 F.2d p. 44. The 4th Circuit Court agreed, 992 F.2d pp. 45–46. The Bankruptcy Court had already determined that debtor was in "subjective bad faith;" but the 4th Circuit Court remanded so the Bankruptcy Court could also consider whether Ch. 11 would be "objectively futile."

Todd cites the *Calder* case in support of a supposed "absolute right" to convert; and relies mainly on this case in urging his motion for stay. As noted above, in *Martin* the 4th Circuit Court cited the Bankruptcy Court opinion in *In re Calder*, 93 B.R. 739 (B.C., D.Utah 1988). Calder, an ex-attorney, had a history of abuse of process. After denial of

discharge in Ch. 7 and termination of automatic stay pursuant to § 362(c)(2)(C), Calder moved to convert to Ch. 13. In a short opinion, the Bankruptcy Court (Allen, J.), citing § 706(a) but paraphrasing the Senate committee report, opined "that the debtor, under this section, has a one-time absolute right of conversion of a liquidation case to a reorganization or individual repayment plan case," *id.* p. 740. But the Bankruptcy Court denied conversion anyway, invoking § 105, because of "unique circumstances" involving Calder's spectacular record of abuse of the system, *id.* The District Court reversed. *The reversal of the order denying conversion was not appealed.* On remand, the Bankruptcy Court granted conversion to Ch. 13; but "[a] few months later ... Calder reconverted the case to Chapter 7," 973 F.2d p. 865. During the 14–month interval between Calder's filing of a motion to convert and the Bankruptcy Court's unwilling grant of said motion, a creditor executed on Calder's individual property, which he had acquired after filing Ch. 7. Later, various issues concerning property of the estate came before the Court of Appeals of the Tenth Circuit ("10th Circuit Court"). Calder argued that his first Ch. 7 was automatically converted when he *filed* his motion to convert, so that his individual post–(Ch. 7)–petition property became property of the Ch. 13 estate at that moment, and creditor execution thereon was stayed under 11 U.S.C. § 362. The 10th Circuit Court ruled that Calder's first Ch. 7 was converted only when the Bankruptcy Court *granted* his motion to convert, his individual property became property of the Ch. 13 estate only at that moment, and creditor execution thereon during the 14–month interval between filing and granting of the motion to convert was not stayed.

In so ruling, the 10th Circuit Court discussed § 706(a) as follows:

> Calder argues that he had an absolute right to convert pursuant to § 706(a) [**fn. 6**] and that the Chapter 13 automatic stay was imposed on the date of his motion ...
>
> > [**6.** The District Court decided that Calder had the right to convert his original Chapter 7 case to Chapter 13 when it reversed the bankruptcy court's order

denying conversion. Thus, at this point it is undisputed that Calder had the right to convert.]

Bankruptcy Rules 1017(d) and 9013 . . . indicate that a *motion* to convert pursuant to § 706(a) is not effective in and of itself, but rather is a request for a court *order* of conversion . . . "The rule makers certainly intended that conversion of a chapter 7 case be accomplished by the entry of an order, not the mere service of notice . . ." *In re Dipalma,* 94 B.R. 546, 549 (Bankr.N.D.Ill.1988).

We agree with Calder's statement that the Bankruptcy Rules cannot override the absolute statutory right to convert pursuant to § 706(a). However, the Rules do not purport to overrule the right to convert; rather, they simply lay out the procedures to be followed to implement a conversion. We perceive no conflict between § 706(a) and Rules 1017(d) and 9013.

For the foregoing reasons, we hold that a conversion from Chapter 7 to Chapter 13 pursuant to § 706(a) becomes effective only upon the entry of a conversion order by the Court . . . ,

*In re Calder,* 973 F.2d p. 867 (emphasis original). The 10th Circuit Court used the phrase "absolute statutory right;" but the 10th Circuit Court was not called on to determine just how "absolute" such right really was. The 10th Circuit Court knew that the question of the *propriety* of conversion under § 706(a) was not before it; it was only concerned with the *effective date* of such a conversion; and it was careful to point that out.

However, *Calder* is not entirely inapplicable to the problem of the *propriety* of conversion. Among other things, Calder claimed the right to amend his claim of exemptions and exempt additional property "more than four years after filing his original Chapter 7 petition and more than one year after the order converting the case to Chapter 13," 973 F.2d p. 867. The District Court refused to allow the amendment. The 10th Circuit Court affirmed, and in so doing made a most interesting comment.

Calder argues that he is entitled to claim additional exemptions listed in his pro-

posed amendment to his B–4 schedule. Generally, schedules in a bankruptcy case "may be amended by the debtor as a matter of course *at any time* before the case is closed." Bankr.Rule 1009(a) . . . *An amendment may be denied, however, if there is bad faith by the debtor or prejudice to creditors . . .,*

*Id.* (emphasis added). That is, although F.R.B.P. 1009(a) says debtor may amend schedules *"at any time,"* courts may still prevent such action in situations of "bad faith by the debtor or prejudice to creditors." If the same reasoning is applied to § 706(a), then even though that statute says debtor may convert from Ch. 7 *"at any time,"* courts may still prevent such action in situations of "bad faith by the debtor or prejudice to creditors."

None of these cases support Todd's assertion of an "absolute right" to convert. *Martin* expressly states that the right of conversion may be "interfered with" in "extreme circumstances." *Finney* agrees, and further holds that "extreme circumstances" include situations in which conversion would be in "subjective bad faith" and "objectively futile." What *Calder* says on this subject is dicta; but its dicta suggest, by analogy with F.R.B.P. 1009(a), that the words "at any time" still allow "denial" of an act in situations of "bad faith by the debtor or prejudice to creditors."

In this Court, the *Spencer* case involved debtor Spencer's attempt (counseled by Todd) to effect immediate conversion from Ch. 7 to Ch. 13 by filing a "notice of conversion." This Court ruled, first, that F.R.B.P. 1017(d) requires conversion by motion and order, not by "notice;" and second, that debtor's right to convert under § 706(a) is subject to denial in situations of bad faith or extreme circumstances. This Court cited *Martin* with qualified approval, and followed *Martin* by adopting its rule of refusing to interfere with conversion absent bad faith or extreme circumstances. The Court distinguished between "bad (or good) faith" in converting to a plan chapter, and "bad (or good) faith" in proposing a specific plan after conversion. In this case, Spencer had been hindering and delaying creditors, but ap-

peared to be answerable at any time in sanctions. The Court decided to allow conversion, to give Spencer a chance to propose a plan, and postpone the question of "bad (or good) faith" until the plan came on for confirmation, see 11 U.S.C. § 1325(a)(3).

In two unpublished rulings, one soon before and one soon after the *Spencer* decision, this Court applied the *Spencer* rule in the *Stegall* case. This case involved debtor Stegall's attempt (counseled by Todd) to effect immediate conversion from Ch. 7 to Ch. 13 by filing a "notice of conversion," soon followed by an application to convert the conversion, from Ch. 7 to Ch. 11 instead of to Ch. 13. The Court ruled again that F.R.B.P. 1017(d) required conversion by motion and order, not by "notice;" and this time refused to allow conversion. To spare Stegall a finding of "bad faith," this Court passed over that issue, but did find "extreme circumstances" in (among other things) Stegall's inability to reorganize. The Court noted that conversion to Ch. 11 would inevitably be followed by reconversion back to Ch. 7, and refused to perform a useless act—to order a useless conversion. In this respect, this Court's decision in *Stegall* is similar to the District and 4th Circuit Courts' rulings in *Finney*. Todd moved for rehearing; the Court denied it.

Todd then appealed to the Federal District Court of this District, which reversed and remanded in an unpublished opinion. In that opinion, the District Court discussed and questioned this Court's ruling in *Spencer* that debtor could not convert under § 706(a) if in bad faith or in extreme circumstances. The District Court questioned *Spencer* because of "(1) the language of § 706(a) [and] (2) the [caselaw] authority ...," District's order p. 5. The District Court said that the statutory words "at any time" mean, in effect, "regardless of circumstances;" cited *Calder*, while admitting that it "involves different issues and facts" and its remarks about § 706(a) "may be dicta," District's order pp. 3, 4; and cited *Martin*, without remarking that this Court's rule in *Spencer* and *Stegall* was taken from *Martin*. But the District Court never did hold that Stegall had an "absolute right" to convert. The

District Court reversed because, it said, this Court had failed to follow its own rule: according to the District Court, the Bankruptcy Court "made no specific finding of 'bad faith' or 'extreme circumstances,'" District's order p. 3. This Court had refused to reach the issue of "bad faith," but it was under the impression that it did find "extreme circumstances" in (among other things) Stegall's inability to reorganize. The District Court went on to say that "[i]n the absence of a finding by the Bankruptcy Court of bad faith ... this Court concludes that extreme circumstances do not exist sufficient to deviate from § 706(a)," District's order p. 5. The latter statement suggests that, even though "extreme circumstances" justify refusing conversion, "bad faith" must be present if circumstances are to be "extreme" enough. This Court was left in doubt whether it was expected to follow its own rule more explicitly, or to follow a somewhat different rule.

On remand, hearing was rescheduled on conversion. Three days before the hearing, Stegall withdrew his notice and/or application to convert.

*Finney* and the District Court opinion in *Stegall* can be read to hold that conversion must be permitted unless there is a showing of *both* "bad faith" and "extreme circumstances" (such as "objective futility" of conversion). This Court does not believe that such a ruling was intended. This Court is aware of no authority which permits any action in any court to continue if in "bad faith" (whether or not "objectively futile"); nor of any bankruptcy authority which permits a debtor (even in "subjective good faith") to attempt a reorganization which is "objectively futile." The 10th Circuit Court's remark in *Calder*, that the phrase "at any time" still permits denial of an action in situations of "bad faith by the debtor *or* prejudice to creditors" (emphasis added), supports this Court's belief.

However, it is not necessary to resolve this particular point at this time. Todd's own authorities agree that conversion can be refused in "extreme circumstances," whatever those may be. This is sufficient to show that Todd's arguments herein, based on a supposed "absolute right" to convert regardless

of circumstances no matter how "extreme," are without merit.

So far, this Court has discussed only the "substantive" aspects of the right to convert under § 706(a). Todd also argues a "procedural" aspect: he proposes that conversion is effected immediately, by the filing of a "notice of conversion" (his method in three cases—*Spencer, Stegall,* and the present case) or by perfunctory order granting a motion to convert (somewhat confusingly combined with a "notice of conversion" in *Stegall* and in the present case).

F.R.B.P. 1017(d) second sentence provides that "Conversion ... pursuant to § ... 706(a) ... shall be on motion filed and served as required by Rule 9013." F.R.B.P. 9013 describes a motion as "[a] request for an order" and requires that "[e]very written motion other than one which may be considered ex parte shall be served by the moving party ... on those entities specified by these rules or ... [on] the entities the court directs." F.R.B.P. 9013 does not say which motions "may be considered ex parte." F.R.B.P. 2002(a)(5) requires 20 days' notice to all parties of "... in a chapter 7 liquidation ... the hearing on ... the conversion of the case to another chapter." F.R.B.P. 2002(a)(5) clearly contemplates that conversions are not to be handled ex parte. Together, these rules provide as follows: debtor must file a motion to convert; 20 days' notice of the motion or of any hearing set thereon must be given to all parties; and only then, if appropriate, may the court enter an order of conversion. As F.R.B.P. 1017(d) third sentence specifies, the use of a "notice of conversion" is reserved for conversion *from*, not *to*, Ch. 12 or 13. In *Calder*, the 10th Circuit Court endorsed these rules, and held that conversion is *not* immediate upon the filing of a motion (let alone a "notice"). In so doing, the 10th Circuit Court showed itself willing to accept an interval of 14 months between motion to convert and order of conversion.

F.R.B.P. 1017(d), 9013 and 2002(a)(5), and Todd's own asserted mainstay, the *Calder* case, provide that conversion proceeds by motion and order with opportunity for hearing, not by "notice" or ex parte order. Todd's continued use of "notices," and his insistence on immediate conversion, are clearly in error.

Finally, Todd argues a Constitutional aspect. He asserts that any refusal to grant immediate conversion to Ch. 12 "denies Mr. Starkey ... his rights to equal protection under the Constitution of the United States of America," motion to reconsider pp. 1–2.

There is no Constitutional right to a discharge, *In re Higginbotham,* 111 B.R. 955, 966–967 (B.C., N.D.Okl.1990), let alone to proceed in bankruptcy under any particular Chapter. The Court does not perceive any classification scheme here, and so is at a loss to find even an opportunity for any denial of equal protection. As for due process, it is a familiar axiom that its "essence" is "an opportunity to be heard." This Court is following the officially prescribed procedure for motions to convert, and in so doing is *providing* parties in interest with maximum opportunity to be heard. It is Todd who disregards the process the law prescribes, and tries to deprive other parties in interest of their own due process and opportunity to be heard.

This Court turns now to more proper issues concerning the stay of orders.

This Court's decision to reject was based in part on uncontroverted evidence of Starkey's history of misbehavior. It is clear that Starkey either will not (according to the Trustee) or cannot (according to Starkey himself) conform his conduct to the requirements of the law, and meet the standard of behavior which must be expected of a debtor-in-possession under any plan chapter. The Court's decision to reject was also based in part on the testimony of Starkey's own witnesses, that Starkey's contracts are no longer economically feasible and that prompt action to redress the combination of mounting costs and declining value was necessary. This Court determined that "rejection of the contracts is necessary, in Chapter 7 or any other Chapter," order denying reconsideration p. 3. The correctness of this conclusion is not challenged, in Starkey's motion to reconsider, or in his motion for stay, or anywhere else.

F.R.B.P. 7062 and 8005 adopt F.R.Civ.P. 62. Rule 62(b) provides that a stay on motion to reconsider should be granted "on such conditions for the security of the adverse party as are proper." Stay on appeal requires either "such terms as will protect the rights of all parties in interest," F.R.B.P. 8005, or supersedeas bond, F.R.Civ.P. 62(d). In this case, the Court ordered rejection because mounting costs and declining value threaten both the estate and the investors. Delay certainly adds cost and may allow further decline in value. Starkey has offered no security. For this reason (even apart from the merits of the dispute over conversion), his motion for stay cannot be granted.

In partly countermanding its order denying reconsideration, granting temporary stay, and holding an emergency hearing on the motion for stay, this Court has bent over backwards for Todd and Starkey. There is no substantial merit to the proposition that conversion is an "absolute right;" there is no merit at all to the procedure of attempting to convert immediately from Ch. 7 by "notice" or perfunctory order. In *Spencer,* in *Stegall,* and now here on behalf of Starkey, Todd has repeatedly urged meritless arguments and attempted erroneous procedures. For the present, it is enough to say that debtor's "Emergency Application for a Stay of Execution on the Order Granting Trustee's Motion to Reject Executory Contracts ..." must be, and is hereby, denied; and that the temporary stay granted by the Court must be, and is hereby, dissolved.

AND IT IS SO ORDERED.